JOHN OWNBEY COMPANY, INC.,
Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.

No. 79–1359.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1980.

Decided April 2, 1981.

Dudley W. Taylor, Ambrose, Wilson & Grimm, Knoxville, Tenn., for petitioner-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert Andrews, Tax Division, U. S. Dept. of Justice, Robt. A. Bernstein, Robt. S. Pomerance, Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.

Before WEICK and ENGEL, Circuit Judges, and CECIL, Senior Circuit Judge.

WEICK, Circuit Judge.

John Ownbey Company (Ownbey), a Tennessee corporation, appeals to this court from a decision of the United States Tax Court holding it liable under the transferee provisions of the 1954 Internal Revenue Code (26 U.S.C. § 6901) in the amount of $26,983.43, plus interest, for the unpaid 1968 income taxes of International Textile Products, Inc. (International), its wholly owned subsidiary. The Commissioner, by notice of deficiency dated June 13, 1974, originally determined that Ownbey was liable as a transferee in the amount of $41,046.46. This amount represented losses Ownbey had sustained in a contract with the Santone Manufacturing Company (Santone) but which International had absorbed. Ownbey petitioned the Tax Court for a redetermination of the liability assessed by the Commissioner. The Tax Court agreed with the Commissioner that Ownbey, not International was a party to the Santone contract, that International had, in effect, absorbed $41,046 of Ownbey's losses on the contract,

and that the losses absorbed by International constituted transfers from International to Ownbey without fair consideration. The Tax Court held, however, that Ownbey was liable as a transferee for only $26,983.43, which represents the amount the Tax Court determined was "transferred" while International was insolvent or which left International insolvent.

In this appeal, Ownbey's principal argument is that it is not a transferee. Specifically, Ownbey contends that the Santone contract was not entered into by it but by International and that International, therefore, did not assume any of Ownbey's losses. Ownbey further contends that even if the contract with Santone was entered into by it, International was not rendered insolvent by assuming Ownbey's contract losses. We reject Ownbey's contention that the Santone contract was International's. The Tax Court's finding that the contract was Ownbey's is supported by substantial evidence. We cannot disregard this finding as being clearly erroneous, even if we believe the evidence which supports it is not, as the Tax Court believed, overwhelming. We do, however, agree with Ownbey that the evidence, when viewed against the correct legal standards, does not support the Tax Court's finding that transfers to Ownbey thereby rendered its subsidiary International insolvent. We accordingly reverse.[1]

## I

Ownbey, at least originally, manufactured military field jackets for the government. Sometime during 1968 but before October 29, of that year, Herman D. Wynn, who owned all of the outstanding shares of stock in Ownbey, sold said shares to Russell Miller. Wynn and Miller were brothers-in-law and, since 1930, had maintained close personal and business relationships. Wynn was an entrepreneur, having owned, managed, or otherwise been involved with over fifty business concerns. At the time of the sale of said shares of Ownbey to Miller, Wynn was an officer of International.

---

1. In view of our disposition of this case it is not necessary that we consider Ownbey's final argument that the Tax Court should not have held it liable for interest on its transferee liability from the date of the notice of deficiency.

In 1968, International had been manufacturing tents and tarpaulins in its LaFollette, Tennessee plant under a renegotiable government contract. This contract had proven very profitable for International during 1968. Within the first ten months of the year, International had realized in excess of $877,000 gross profits on gross sales of less than $1,900,000. Fearing this lucrative contract would be renegotiated to their disadvantage, International's shareholders decided to sell their shares for a bargain price.

International's shareholders offered Wynn their shares for $150,000. Wynn apparently was not interested, but he told Miller of the offer and advised him that the acquisition of International's stock would be a good investment for Ownbey. Miller accepted Wynn's advice and Wynn agreed to represent Ownbey during negotiations for purchase of the stock. Wynn further agreed to act as chief operating officer of International and to represent International in renegotiation of the government contract should Ownbey acquire its stock. By agreement of October 29, 1968, Ownbey acquired all outstanding shares of International stock for $105,000, plus approximately $8,000 in temporary compensation for International's officers. In addition, Ownbey agreed to hold harmless International's shareholders against any federal tax liability or any liability that might arise as a result of renegotiation of the government contract.

In May or June of 1968, or some months before Ownbey's acquisition of International's stock, Wynn had talked to representatives of the Santone Manufacturing Company (Santone),[2] apparently acting for Ownbey, concerning the production of boys' suits and sportcoats by Ownbey for Santone. In October or November of 1968, Ronald R. Monford, a Santone representative, visited Knoxville, Tennessee to meet with Wynn. Wynn, however, was not available, so Miller showed Monford Ownbey's production facilities, and discussed manufacturing boys' clothing for Santone. The two men reached an agreement, the terms of which were restated in a letter Monford sent to Miller on November 16, 1968.

The Santone contract was terminated on March 4, 1970. It resulted in a net loss of $41,046 over the life of the contract to Ownbey. Both Ownbey and International, however, operated under the assumption that the contract, and as a consequence the profits and losses under the contract, were International's.[3] Thus, contract expenses which International incurred were not charged to Ownbey, while International was charged with the contract expenses which Ownbey incurred and credited with payments Ownbey received from Santone.

It is undisputed that International paid $27,657.83 in wages and payroll taxes to employees working on the Santone contract between February 14, 1970 and the termination of the contract on March 4, 1970. It is, however, disputed as to when and how International absorbed the balance of the contract losses. To answer this question, the Tax Court relied almost exclusively on a "notes receivable" account maintained by International for Ownbey.

The first significant entries to the notes receivable account were adjusting entries totalling $14,161.76 made by International's accountants at the close of its 1969 fiscal year to reflect losses on the Santone contract during the year. These entries signified the amount the contract expenses incurred by Ownbey exceeded contract revenues. The effect of the entries was to increase International's indebtedness to Ownbey by the amount of the loss.

There were no additional entries made to the notes receivable account until after the Santone contract had been terminated. An entry was made on March 31, 1970, the end

2. When Wynn first began negotiations, Santone operated under the name Juvenile Manufacturing Company. Shortly thereafter it became known as the Santone Manufacturing Company.

3. As previously mentioned, the Tax Court found that the contract was Ownbey's.

of Ownbey's fiscal year, increasing International's indebtedness to $74,352.68, though it is not clear why this entry was made other than it was unrelated to the Santone contract. On May 31 and June 30, 1970, entries were made to record the transfer of International's interest in an oil royalty valued at $71,248.13 to Wynn Inc., an Ownbey creditor. As a result of this transfer, made with the consent of Ownbey, the balance of the notes receivable account was reduced to $3,104.55 due Ownbey.

Three additional entries to the notes receivable account were made in 1970. All were adjusting entries made on November 30, 1970, the end of International's fiscal year. The first was to record the sale of equipment by International to Ownbey and served to completely eliminate International's debt to Ownbey. The final two adjusting entries were made to record previously unrecorded contract revenues of $3,422.47 and contract expenses of $2,864.80. Taken together, these final two entries reflect a profit of $773.67 earned on the Santone contract during International's 1970 fiscal year.

On its income tax return for 1968, International reported tax due of $240,476.99. The company, however, reported losses for its taxable years ending November 30, 1969 and 1970 of $143,004.64 and $170,184.00, respectively. It appears that most of these losses resulted from the operation of four "factory discount" retail clothing stores, one of which opened in November of 1968 and three of which were opened either after or about the same time the Santone contract was terminated. In June or July of 1970, International applied for a tentative refund on its 1968 income tax liability based on its losses in 1969. The application was granted, and on September 4, 1970, International received an income tax refund of $72,771.95, plus interest.

By deficiency notice dated December 23, 1971, the Commissioner notified International that it owed $165,543.59 for its 1968 taxable year. This amount included the refund it had received in 1970. International petitioned the Tax Court for a redetermination of this deficiency. Pursuant to a stipulation of the parties, the Tax Court entered judgment on April 16, 1973 in favor of the government in the amount of $163,264.46 and additions to tax under Sections 6652(a) and (b) of the Code in the amounts of $5.00 and $8,163.22 respectively. International, however, had become, and remains, insolvent. Unable to collect from International, the Commissioner thus proceeded under Section 6901 of the Internal Revenue Code of 1954 against Ownbey as a transferee.

## II

■ Section 6901 of the Internal Revenue Code neither defines nor creates transferee liability.[4] The section merely provides a procedure by which the government may collect from a transferee the unpaid taxes of a transferor. Whether a transferee is liable for the unpaid taxes depends on state law. *Commissioner v. Stern*, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958). Or stated otherwise, the "Government's substantive rights against the transferee are precisely those which other [defrauded] creditors would have under [the law of the state in which the transfers were made]." *Delia v. Commissioner*, 362 F.2d 400, 402 (6th Cir. 1966).

■ In the instant case, Ownbey's liability is predicated on Section 64–312 of the Tennessee Code which provides:

Every conveyance made and every obligation incurred by a person who is or will be

4. Section 6901 (26 U.S.C.) in part provides:
Method of collection.—
(a) The amounts of the following liabilities shall, . . . be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, estate, and gift taxes.—
(A) Transferees.—The liability, at law or in equity, of a transferee of property—
(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes).

thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

This provision, which is from the Uniform Conveyance Act, thus requires proof of two essential elements: (1) absence of fair consideration, and (2) insolvency at the time of transfer. Further, under Section 6902(a) of the Internal Revenue Code, the burden of proving these two elements was on the Commissioner.[5]

As earlier mentioned, the Tax Court concluded that International had absorbed $41,045.92 of Ownbey's losses on the Santone contract and by so doing had transferred assets equal to the losses absorbed without fair consideration. A significant portion, or $26,884.16, of the total amount transferred represented the $27,657.83 in wages and payroll taxes International paid to Ownbey employees working on the contract between February 14 and March 4, 1970 offset by the contract profits, or consideration received, of $773.67 earned in 1970. The remaining $14,161.76 represented losses incurred in 1969 but which the Tax Court concluded International absorbed in 1970 after the contract had been terminated.

The Tax Court's analysis leading to this latter conclusion was, as it noted, "somewhat technical and complex" and depended entirely on entries to the notes receivable account International maintained for Ownbey. The Court first looked to the credit balance in the account before the first of the entries recording the transfers of the oil royalty and equipment. According to the notes receivable account, International owed $74,352.68. Of this amount, $14,-161.76 represented 1969 contract losses re-

corded by the November 30, 1969 year-end adjusting entry. The May 31 and June 30, 1970 entries made to reflect the transfer of the oil royalty valued at $71,248.13 reduced the credit balance to $3,104.55. And the November 30, 1970 adjusting entry made to record the sale of equipment reduced the balance to zero. Thus, during 1970 International transferred assets worth $74,352.68 in satisfaction of its debt to Ownbey of equal amount. The Tax Court, however, reasoned that since $14,161.76 of International's indebtedness arose out of a contract for which it was not liable, International's actual indebtedness was only $60,190.92. International therefore, according to the Tax Court, transferred assets valued at $74,-352.68 in satisfaction of a $60,190.92 debt, and the difference, the Court concluded, represented transfers without fair consideration.

In reaching this conclusion, the Tax Court purported to rely on Section 64–311 of the Tennessee Code, which provides:

Fair consideration is given for property, ... (a) when in exchange for such property ... as a fair equivalent therefore, and in good faith, ... an antecedent debt is satisfied.

Under this provision, which is taken from the Uniform Fraudulent Conveyance Act, fair consideration need not be present consideration; the satisfaction of an antecedent debt will qualify. *In re B–F Building Corp.*, 312 F.2d 691 (6th Cir. 1963); McLaughlin, *The Uniform Fraudulent Conveyance Act*, 46 Harv.L.Rev. 404 (1933). This much the Tax Court apparently recognized. Nonetheless, even accepting that the $14,161.76 credited to the notes receivable account was not a debt within the meaning of the statute,[6] we are not convinced that

---

5. Section 6902(a) provides:

(a) Burden of proof.—In proceedings before the Tax Court the burden of proof shall be upon the Secretary or his delegate to show that a petitioner is liable as transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

6. Under Section 64–308 of the Tennessee Code, a debt "includes any legal liability, whether

matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." The Tax Court looked no further than to whether International was liable on the contract. But the fact that International was not liable on the contract does not necessarily mean that it was not also "legally liable" to Ownbey for the amount credited to the account. The question should simply have been whether Ownbey could have reduced to judgment the amount

the assets transferred were not the "fair equivalent" of the debt satisfied. Though there are no Tennessee decisions bearing directly on this issue, "fair equivalent" under the Uniform Act has not been held to mean "exact equivalent." *See e. g., Utah Assets Corp. v. Dooley Brothers Association,* 92 Utah 577, 70 P.2d 738 (1937). Rather than look simply at the nominal values of the assets transferred, courts have looked at all the surrounding circumstances to determine whether the transaction was fair and the "antecedent debt . . . is . . . not disproportionately small as compared to the payments received."[7] *DeAragon v. Chase Manhatten Bank,* 457 F.2d 263, 266 (1st Cir. 1972).

We accept for present purposes, however, the Tax Court's conclusion that International transferred $41,045.92 worth of assets without fair consideration. ($26,884.16 in wages and taxes plus $14,161.76 in contract losses recovered through transfers of oil royalty and equipment). Ownbey's liability as a transferee therefore depends on the extent to which the transfers were made while International was insolvent or thereby rendered insolvent.

To determine insolvency, the Tax Court first looked to International's balance sheet as stated in Schedule L of its tax returns for the years ending November 30, 1969 and 1970. After making adjustment for International's 1968 tax deficiency and the tax refund it received in 1970, the Court concluded that on November 30, 1969 International's assets exceeded its liabilities by $14,062.49 and that on November 30, 1970 International was insolvent, its liabilities exceeded its assets by $88,320.51.[8] Based upon the adjusted balance sheets for the end of International's 1969 and 1970 tax years, and the fact that International transferred $41,045.92 worth of assets in 1970, the Court determined, "International was rendered insolvent by the transfers of assets to Ownbey equal to $26,983.43, the balance resulting from subtracting $14,062.49 from $41,045.92."

In this appeal, Ownbey challenges the Tax Court's determination on two fronts. It first argues it is immaterial that International's liabilities may have grown larger than its assets in 1970. Relying on *Ottarson v. Dobson & Johnson, Inc.,* 58 Tenn.App. 408, 430 S.W.2d 873 (1968), Own-

credited to the account under any theory of Tennessee law.

7. Between November 30, 1968 and the transfers of the oil royalty on March 31, 1970, the notes receivable account indicates that International's indebtedness unrelated to the contract varied from $115,000 to $38,000. In determining whether the transfers of assets for a fair consideration, we believe the Tax Court should have at least considered the value attached to International's use of Ownbey's money.

8. Schedule L of International's tax return for 1969 showed assets of $397,989 and liabilities of $293,434, or a net worth of $104,555. On its 1970 return, International had assets of $161,902 and liabilities of $159,730, or a net worth of $2,172. International's tax returns for the years 1969 and 1970, however, did not reflect the deficiency for its 1968 tax or the refund it received in 1970. Thus, for both years, the court added as an additional liability the tax deficiency of $163,264.44. Also, for both years, the court included as an additional asset the tax refund of $72,771.95. (As earlier noted, the refund was later disallowed. It was considered as an asset, however, because the deficiency included the disallowed refund. In other words, had International not received the re-

fund, its deficiency would have been reduced by $72,771.95).

Though Ownbey argues otherwise, we believe the Tax Court was correct in considering the deficiency as an additional liability. *Bowlin v. Commissioner,* 31 T.C. 188 (1958), aff'd per curiam, 273 F.2d 610 (6th Cir. 1960); *Kreps v. Commissioner,* 351 F.2d 1 (2nd Cir. 1965). Indeed, we agree with the Commissioner that the court should have also considered the interest and penalties on the deficiency as well as the interest paid on the refund. *Kreps v. Commissioner, supra,* 9 Mertens, *Law of Federal Income Taxation,* ¶ 53.32 at 47 (1977 ed.). Moreover, we think it conceivable that other modifications to the balance sheet could have or should have been made. First, it is not entirely clear why depreciation of fixed assets for the entire 1970 tax year should be considered for determining insolvency. Secondly, since International's liabilities presumably included the amount it thought it owed Ownbey, and since the Tax Court determined that $14,161.76 of this amount was actually not owed to Ownbey, it would seem to follow that International's liabilities should have been reduced to reflect its true indebtedness.

bey contends that the fact International operated as a going concern precluded a finding that it was insolvent. We think this argument is without merit. In *Ottarson* it was admitted that the transferor-corporation was insolvent within the meaning of Section 64–309 of the Tennessee Code, the provision which defines insolvency as used in Section 64–312.[9] That the transferor operated as a going concern was, in *Ottarson*, relevant only in determining insolvency for purposes of imposing liability under the trust fund doctrine, a matter not in issue here. We have previously held that a person is insolvent under Section 64–309 when "the fair market value of the individual's property will not cover his obligations as they fall due." *Hyde Properties v. McCoy*, 507 F.2d 301, 307 (6th Cir. 1974). We believe the Tax Court's finding that International was insolvent as of November 30, 1970 is consistent with this definition of insolvency.

■ We agree, however, with Ownbey's final argument concerning the relationship between International's insolvency and its transfers to Ownbey. By simply subtracting the amount transferred to Ownbey during 1970 from International's opening net worth, the Tax Court assumed that conveyances were fraudulent to the extent they contributed to insolvency. But Section 64–312 of the Tennessee Code defines as fraudulent only "a conveyance ... by a person *who is or will be thereby rendered insolvent.*" "The mere fact that a transfer has been made does not establish transferee liability. A solvent person may dispose of his property as he sees fit." 9 Mertens, *Law of Federal Income Taxation*, ¶ 53.32 at 47 (1977 ed.). To find a transfer fraudulent, therefore, a court must first find that

the transferor was insolvent at the time of the transfer or immediately thereafter.[10] *Hyde Properties v. McCoy*, 507 F.2d at 307; *In re Knox Kreations, Inc.*, 474 F.Supp. 567, 571 (E.D.Tenn.1979). This, the Tax Court did not do and, on the record now before us, this it could not have done.

We acknowledge that in many instances it is most difficult to prove insolvency on a given date, and the determination of insolvency may not always be susceptible of precise proof. *See Haynes & Hubbard, Inc. v. Stewart*, 387 F.2d 906, 907 n. 1 (5th Cir. 1967). Here, however, the Commissioner did not even attempt to prove that International was insolvent at any time other than at the end of its 1970 tax year. Though it is quite possible that International was insolvent before this, it certainly cannot be assumed that it was insolvent when the transfers were made months before the end of the 1970 year and at least two months after the end of its 1969 year.[11] *W. Cleve Stokes v. Commissioner*, 22 T.C. 415 (1954); *James M. Denton v. Commissioner*, 21 T.C. 295 (1953); 9 Mertens, *Law of Federal Income Taxation*, ¶ 53.32 at 47 (1977 ed.). This is especially true where, as here, the transferor throughout the year was a going concern whose assets and liabilities changed as it did business.

### III

For the foregoing reasons, the decision of the Tax Court is reversed.

**9.** Section 64–309 provides:
A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

**10.** Since there was more than one transfer, the Commissioner was required to prove insolvency as of the date of each. *George M. Newcomb v. Commissioner*, 23 T.C. 954 (1955); 9 Mer-

tens, *Law of Federal Income Taxation*, ¶ 53.32 at 47 (1977 ed.).

**11.** For this reason, we reject the alternative theory advanced by the Commissioner. Whatever the opening net worth of International might have been, the first transfers were not made until February of 1970. It simply cannot be assumed that International's net worth did not change for the better during this period.