PERRY SEGURA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PERRY SEGURA, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1178–79, 1272–79.     Filed Septemper 30, 1981.

---

*D. Irvin Couvillion*, for the petitioners.
*Alan H. Kaufman*, for the respondent.

FAY, *Judge*: Respondent determined that petitioners, as transferees of assets, are liable for a deficiency of $64,227.70 in their transferor's Federal income taxes for the transferor's taxable years ending September 30, 1970, and September 30, 1971.[1] The issues for decision are whether petitioners are transferees within the meaning of section 6901 and, if so, to what extent.[2]

<h2 style="text-align:center">FINDINGS OF FACT</h2>

Some of the facts have been stipulated and are found accordingly.

These cases have been consolidated for purposes of trial, briefing, and opinion.

Petitioner Perry Segura's residence and petitioner Perry Segura, Inc.'s principal place of business were both in New Iberia, La., when petitioners filed their respective petitions herein.

Petitioner Perry Segura (Segura) is an architect who has been practicing his trade since 1956. On June 1, 1960, Segura caused Perry Segura & Associates, Inc. (Associates), to be incorporated in Louisiana. Associates was formed to operate

---

[1] The parties stipulated that the $64,227.70 could be broken down as follows:

| Transferor's year | Deficiency | Sec. 6653(a) addition to tax |
|---|---|---|
| FYE 9/30/70 | $17,151.07 | $1,042.54 |
| FYE 9/30/71 | 43,832.47 | 2,191.62 |

We note that the stipulated amounts total $64,217.70 rather than $64,227.70, and it appears from the certificate of assessments and payments introduced herein that the stipulated amount is the correct one. We are confident that the parties can resolve this discrepancy in the Rule 155 computation.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended.

Segura's architectural practice and to limit Segura's personal liability.[3] At all times relevant to this proceeding, Segura was the sole shareholder, the president, and a director of Associates.[4]

When Associates was formed, Segura delegated to Owen Breaux (Breaux) and the accounting firm with which Breaux was associated, the responsibility for maintaining separate books and records for Segura, as an individual, and Associates, and for allocating receipts and payments between Segura and Associates.[5] In Segura's own words, the business records and tax returns were left "strictly up to him [Breaux] and his office."

The line for allocation between Segura and Associates was not always clear. The main cause of confusion seems to be that Associates' primary business bank account, which was maintained at the State National Bank in New Iberia, La. (the State National account), remained in Segura's name even though after Associates' formation, the account was carried on Associates' books and records as a business account and was intended to be Associates' account. Nevertheless, there were withdrawals from and deposits to the State National account which were properly allocable to Segura.

The problems created by Segura's continued use of the State National account were resolved by a "Loans Receivable—Officer (Perry Segura)" account (the loans receivable account) being established on Associates' books and records.[6] When a check allocable to Segura was drawn on the State National account, the check amount would be added to the loans receivable account as an amount due to Associates from Segura. Likewise, when a deposit allocable to Segura was

---

[3]Associates operates and files its Federal income tax returns on a fiscal year ending (FYE) Sept. 30.

[4]When Associates was formed, Segura received 90 percent of Associates' stock. However, Segura was the sole shareholder of Associates from at least Sept. 30, 1968, through Sept. 30, 1975.

[5]Breaux is a certified public accountant who has been in private practice since 1950. He or those with whom he practices have handled the various Segura accounts from the beginning of the various business entities.

[6]Bank accounts, other than the State National account, were maintained in Segura's name but used by Associates, although to a lesser extent than the State National account. Withdrawals from and deposits to those accounts were handled in the same manner as the State National account discussed in the text *infra*.

made to the State National account, the loans receivable account would be adjusted so as to reduce the amount Segura owed Associates.

The loans receivable account was an active account from the time of Associates' inception. Not only was that account used to allocate the transactions with respect to the State National account and other bank accounts, it was used as a means of compensating Segura. On numerous occasions, the amount Segura owed Associates was reduced with such reduction being recorded as "payroll" or as a "bonus" to Segura.[7]

Breaux's recordkeeping was not based on wild guesses.[8] The basic premise was that all architectural business was allocable to Associates while other ventures were allocable to Segura.[9] If an allocation or reporting position was questionable, Breaux would contact Segura's office to ascertain the correct result.

Sometime in 1972, Segura informed Breaux that as of January 1, 1972, Segura no longer wanted Associates to operate as an active corporation. Segura suggested that all assets, especially bank accounts and notes, be transferred from Associates to Segura. As of September 30, 1972, the loans receivable account reflected $107,887.03 as the amount owed by Segura to Associates. Breaux informed Segura that erasing or reducing that debt would require Segura to report dividend income. Accordingly, sometime between October 1, 1972, and December 31, 1972, a dividend of $107,459.58 was paid by Associates to Segura. Segura reported such dividend on his 1972 Federal income tax return. That dividend reduced the amount Segura owed Associates.

Some assets remained on Associates' books and records after 1972. Among them was a camp located on Lot 25–1, Cypremort Point, La. (Camp-Cypremort Point or the camp). Camp-Cypremort Point consists of buildings and improvements, including

---

[7]Although the loans receivable account was active after 1971, the account entries after 1971 do not specify any amounts reducing Segura's indebtedness to Associates as being compensation.

[8]Not all recordkeeping was done by Breaux personally; some was done by the firm with which Breaux was associated.

[9]For example, Segura was involved in farming operations, real estate ventures, and contracting.

furnishings. The land upon which Camp-Cypremort Point rests is not at issue in this case.

On September 16, 1969, third party vendors executed a deed transferring title to Camp-Cypremort Point to Perry Segura, Inc., for $26,000. Perry Segura, Inc. (Segura, Inc.), is Segura's wholly owned corporation. Segura formed Segura, Inc., on August 1, 1965, for the avowed purpose of having a corporate entity to hold title to what he considered to be high risk assets. Segura, Inc., reported "no activity" or "no operations" on its Federal income tax returns filed for its taxable years ending September 30, 1971, through September 30, 1977.[10] In essence, Segura, Inc., has been inoperative since at least 1970.

While the deed to the camp named Segura, Inc., as the vendee, the camp was in fact an asset of Associates. Of the $26,000 paid for Camp-Cypremort Point, $8,000 was paid on closing, and $18,000 was represented by three notes for $6,000 each, due on September 15, 1970, September 15, 1971, and September 15, 1972, respectively. The $8,000 downpayment was made with a check drawn on an account maintained in Segura's name at the Sugarland State Bank in Jeanerette, La. Originally, Associates recorded the $8,000 as increasing the amount Segura owed Associates as reflected in the loans receivable account; but, before the close of Associates' fiscal year ending September 30, 1969, Associates reversed that entry by decreasing by $8,000 the amount Segura owed Associates as reflected in the loans receivable account. Thus, the $8,000 was treated on Associates' books and records as Associates' expense rather than Segura's.

The three $6,000 notes payable were carried on Associates' books and records under the heading "Camp Notes Payable Edna Roy 'et al. [the vendors]" with the following notation: "sale is in name of Perry Segura, Inc., to be transferred to Perry Segura & Assoc., Inc." The note due on September 15, 1970, and its allocable interest were timely paid by a check drawn on the State National account. The two remaining

---

[10]We do not have before us Segura, Inc.'s Federal income tax returns for its taxable years ending before Sept. 30, 1970. On its Federal income tax return filed for the fiscal year ending Sept. 30, 1970, Segura, Inc., reported no income and $10 in deductions. On his Federal income tax return filed for 1971, Segura reported $16,000 in salary from Segura, Inc. That return was accompanied by a corresponding W–2 form, but no corresponding deduction was claimed by Segura, Inc., on its Federal income tax returns.

notes were transferred to Segura in September 1972 and the amount reflected in the loans receivable account as owing from Segura to Associates was reduced accordingly.[11]

Between December 1969 and September 1972, various improvements were made to Camp-Cypremort Point at a total cost of $10,072.62. Of that amount, $3,359.88 was paid from the State National account; $3,632.55 was paid by Segura through an account maintained by him at the New Iberia National Bank; and $3,080.19 was paid through an account maintained in Associates' name at the New Iberia National Bank. The amounts paid by Segura served to reduce the amount reflected in the loans receivable account as owing from Segura to Associates.[12]

In addition to carrying Camp-Cypremort Point on its books and records, Associates took depreciation deductions with respect to Camp-Cypremort Point on its Federal income tax returns filed for its taxable years ending September 30, 1970, through September 30, 1975. On its Federal income tax return for its taxable year ending September 30, 1976, Associates reported that Camp-Cypremort Point was transferred to Segura, Inc. Associates' books and records reflect that such a transfer was made to Segura, Inc., on January 1, 1976, for $21,784.05—the remaining depreciable basis on that date. The fair market value of Camp-Cypremort Point was at least $107,168 on January 1, 1976. Camp-Cypremort Point first appeared as an asset on Segura, Inc.'s Federal income tax return filed for the taxable year ending September 30, 1976.[13]

By deed dated July 26, 1979, Segura transferred Camp-Cypremort Point and the underlying land to Warren O. Rush,

---

[11]Notes payable totaling $275,302 were transferred to Segura. One credit in that total amount was entered in the loans receivable account reducing Segura's debt to Associates.

[12]Evidently, the amounts paid by Segura and the amounts paid through the account maintained in Associates' name were both treated as payments by Segura, personally, which entitled him to a reduction of the debt he owed Associates. Nevertheless, whether the payments made through the account maintained in Associates' name are treated as direct expenditures of Associates or as indirect expenditures of Associates via a reduction of Segura's indebtedness to Associates, those payments are ultimately Associates' expenses.

[13]Segura, Inc., listed its assets as being $2,000 in cash (paid-in capital), $194 in accounts receivable, and $10 in other assets on its Federal income tax returns filed for its taxable years ending Sept. 30, 1970, through Sept. 30, 1972. No asset schedules were attached to Segura, Inc.'s Federal income tax returns filed for its taxable years ending Sept. 30, 1974, and Sept. 30, 1975.

an unrelated vendee. Attached to that deed was a certified resolution of the Board of Directors of Segura, Inc., avowing that:

the property authorized to be transferred herein [Camp-Cypremort Point, improvements thereto, and the underlying land] is not the property of this corporation [Segura, Inc.] but rather is the property of Perry J. Segura, * * * , and that any title to such property acquired in the name of this corporation was done for the convenience of the parties only and no actual ownership is or every [sic] was vested in this corporation.

In actuality, Segura, Inc., never held anything more than bare legal title to Camp-Cypremort Point.

In a statutory notice sent to Associates on March 8, 1974, respondent determined the following deficiencies in and additions to Associates' Federal income taxes:

| Associates' taxable year | Deficiency | Sec. 6653(a) addition to tax |
| --- | --- | --- |
| FYE 9/30/70 | $111,920.14 | $5,596.01 |
| FYE 9/30/71 | 129,432.71 | 6,471.64 |

Associates filed a timely petition with this Court for a redetermination of those deficiencies and additions to tax.

Pursuant to an agreement between Associates and respondent, this Court entered a decision on November 4, 1977, finding the following deficiencies in and additions to Associates' Federal income taxes:

| Associates' taxable year | Deficiency | Sec. 6653(a) addition to tax |
| --- | --- | --- |
| FYE 9/30/70 | $20,850.96 | $1,042.54 |
| FYE 9/30/71 | 43,832.47 | 2,191.62 |

That decision, which became final on February 2, 1978, provided that Associates, the petitioner therein, expressly waived the section 6213(a) restrictions barring assessment and collection until the decision became final. The deficiencies in and additions to tax owed by Associates were assessed on November 18, 1977.

On May 2, 1978, Associates paid respondent $48,867 representing receivables due from Segura, Inc., of $30,920 and receivables due from Segura of $17,947. That $48,867 was applied first to interest and, second, to the payment of tax. Part of the payment was used to eliminate deficiencies in

Federal income taxes owed by Associates for its taxable years ending September 30, 1968, and September 30, 1969. No further payments have been made on the deficiencies in and additions to Federal income taxes owed by Associates. The amounts still due are as follows:

| Associates' taxable year | Deficiency | Sec. 6653(a) addition to tax[14] |
|---|---|---|
| FYE 9/30/70 | $17,151.07 | $1,042.54 |
| FYE 9/30/71 | 43,832.47 | 2,191.62 |

Associates is without assets to pay the amounts due, and respondent has exhausted all remedies to collect from Associates. Associates has been insolvent at all times since September 30, 1971, both in that its liabilities exceed its assets, and in that it is unable to pay its debts as they become due in the usual course of business.

In separate statutory notices of deficiency sent to Segura, Inc., and to Segura on November 17, 1978, respondent determined that each petitioner was liable, as a transferee of assets, for the taxes and additions to tax due for Associates' taxable years ending September 30, 1970, and September 30, 1971. The notice sent to Segura, Inc., identified Camp-Cypremort Point as the transferred asset; however, the notice sent to Segura only asserted transfers to Segura in excess of the owed amounts without identification of any specific transfers.

## OPINION

These cases involve transferee liability asserted against petitioners—Segura, an individual, and Segura, Inc., his wholly owned corporation—for the unpaid income taxes and additions to tax of Associates, another corporation wholly owned by Segura. The issues for decision are whether petitioners are transferees within the meaning of section 6901 and, if so, to what extent.[15]

---

[14]See note 1 *supra.*

[15]Petitioner Segura maintains that respondent is barred by the statute of limitations from asserting transferee liability against Segura because Segura was not sent a timely valid notice of deficiency. The applicable provision is sec. 6901(c)(1), which provides that the period of limitations for assessment of transferee liability against an initial transferee is 1 year from the last day respondent could make an assessment against the transferor.

Section 6901 provides, in part, as follows:

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) INCOME, ESTATE, AND GIFT TAXES.—

(A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *

Thus, section 6901 does not create transferee liability but merely provides a procedure for respondent to collect from a transferee the unpaid tax liability of a transferor.

Basically, respondent has only the substantive rights against a transferee which other creditors have (*John Ownbey Co. v. Commissioner*, 645 F.2d 540 (6th Cir. 1981), revg. on other grounds a Memorandum Opinion of this Court), and whether a transferee is actually liable for the unpaid tax

---

We do not have before us the facts necessary to determine precisely the last day respondent could have entered an assessment against Associates. However, it is clear that respondent had at least until Jan. 3, 1978—60 days after this Court's decision determining the deficiencies and additions to tax against Associates—to make that assessment. See sec. 6503(a)(1). Therefore, respondent had at least until Jan. 3, 1979, to make an assessment against Segura as an initial transferee. The notice of deficiency to Segura was sent on Nov. 17, 1978, well within that period, and that notice serves to toll the period of limitations. Sec. 6901(f). Petitioner Segura seeks to avoid the application of the sec. 6901(f) tolling by contending that the notice of deficiency mailed to him was insufficient because it failed to identify the assets allegedly transferred from Associates to Segura. We disagree.

While sec. 6212(a) requires the sending of a notice of deficiency, there is no Code provision specifying the form or required content of such a notice. "The essential purpose of a deficiency notice is to provide a formal notification that a deficiency in taxes has been determined." *Mayerson v. Commissioner*, 47 T.C. 340, 349 (1966). Anything that serves that notice function so the taxpayer knows the amount of the asserted deficiency and the taxable period to which it relates is sufficient. See *Olsen v. Helvering*, 88 F.2d 650, 651 (2d Cir. 1937); *Shamrock Oil Co. v. Commissioner*, 77 F.2d 553 (5th Cir. 1935), affg. 29 B.T.A. 910 (1934); *Estate of Smith v. Commissioner*, 16 T.C. 807 (1951).

The notice challenged herein clearly informed petitioner Segura that he was to be assessed as a transferee for Associates' taxable years ending Sept. 30, 1970, and Sept. 30, 1971. We find no requirement that respondent delineate the relied upon transfers. This is especially true since respondent bears the burden to show each transfer. See sec. 6902(a). We conclude that respondent sent petitioner Segura a valid notice of deficiency well within the applicable period of limitations under sec. 6901(c)(1), and such notice of deficiency serves to toll that period of limitations. Sec. 6901(f).

Likewise, we reject Segura's contention that a Louisiana one-year statute of limitations applies. It is clear that State statutes of limitations are irrelevant in procedures brought pursuant to sec. 6901. *Phillips v. Commissioner*, 283 U.S. 589 (1931).

liability of the transferor is determined under State law. *Commissioner v. Stern*, 357 U.S. 39 (1958). The law of Louisiana applies herein. Respondent bears the burden of proving that petitioners are liable as transferees. Sec. 6902(a); Rule 142.[16] Petitioners bear the burden of proving that the transferor was not liable for the unpaid tax liability. Sec. 6902(a); Rule 142(a). The parties herein have stipulated as to the transferor's unpaid tax liability. Furthermore, that liability has been determined by a final decision of this Court. See generally *Krueger v. Commissioner*, 48 T.C. 824, 830 (1967).

While transferee liability is asserted against each petitioner herein based on transfers from the same transferor (Associates), the facts and the applicable State law vary as to each petitioner. Therefore, we shall address the issues as to each petitioner separately.

The transferee liability asserted against petitioner Segura is predicated on respondent's contentions that Segura received a dividend from Associates in late 1972 and that, since such dividend was unlawful under Louisiana law, Segura is liable for Associates' unpaid tax liability up to the amount of that dividend.[17] Segura maintains that the dividend does not constitute a transfer of property from Associates because it resulted from a mere book entry in a "fictional" account rather than from an actual distribution of cash or property. Alternatively, Segura contends that, even if the dividend was a transfer of property, that transfer does not give rise to transferee liability because respondent is estopped from basing liability on the dividend. We find neither of Segura's contentions meritorious, and hold for respondent on this issue.

Segura formed Associates in 1960 to operate his architectural practice, and delegated to his accountant the responsibility for segregating his and Associates' operations. Such segregation was accomplished principally through a loans receivable account set up on Associates' books and records which reflected amounts owing from Segura to Associates. The loans receivable account was maintained actively from Associates'

---

[16]All Rule references are to the Tax Court Rules of Practice and Procedure.

[17]Respondent also contends that transferee liability attaches to Segura with respect to Associates' transfer of an automobile and an airplane to Segura. However, given our holding, *infra*, that the dividend, which alone exceeds in amount Associates' unpaid tax liability, causes Segura to be liable as a transferee, we see no reason to enter upon a lengthy analysis concerning the automobile and the airplane.

incorporation to the time Associates became essentially inoperative.

In 1972, Segura decided that he no longer desired to operate Associates as an active corporation and proposed that all Associates' assets be transferred to him. As of September 30, 1972, the loans receivable account reflected $107,887.03 as the amount owed by Segura to Associates. Segura's accountant advised Segura that erasing or reducing that debt would require Segura to report dividend income. Sometime between October 1, 1972, and December 31, 1972, a dividend of $107,459.58 was paid by Associates to Segura. Segura reported such dividend on his 1972 Federal income tax return. That dividend reduced the amount Segura owed Associates.

Louisiana Revised Statutes Annotated section 12.93D provides, in part, as follows:

> Every shareholder who receives any unlawful dividend or other unlawful distribution of assets shall be liable to the corporation, or to the creditors of the corporation, or to both, in an amount not exceeding the amount so received by him.

Accordingly, in Louisiana, if a shareholder receives an "unlawful" dividend or distribution, that shareholder is liable to the corporation's creditors up to the "unlawful" amount received.

A dividend is "unlawful" if the corporation is either insolvent or would be rendered insolvent by payment of the dividend. La. Rev. Stat. Ann. sec. 12:63.[18] The parties stipulated that Associates has been insolvent at all times since September 30, 1971, both in that its liabilities exceed its assets, and in that it is unable to pay its debts as they become due in the usual course of business. See generally La. Rev. Stat. Ann. secs. 12:1.L and 12:63.B. Therefore, any dividend paid by Associates to Segura, its sole shareholder, after September 30, 1971, was "unlawful" and rendered Segura liable to Associates' creditors, including respondent, up to the amount of that dividend.

We have found as a fact that Associates paid Segura a dividend of $107,459.58 by canceling a debt of Segura's to Associates in that amount. That dividend was paid sometime

---

[18]There is no requirement under La. Rev. Stat. Ann. sec. 12:93.D that the creditor prove that the dividend was paid or received fraudulently. *Abraham v. Lake Forest, Inc.*, 377 So.2d 465, 470–471 (La. App. 1979).

between October 1, 1972, and December 31, 1972, which is well after September 30, 1971. Thus, the dividend was "unlawful," and Segura became liable as a transferee for up to $107,459.58, the amount of the dividend.[19]

We reject Segura's attempt to characterize the dividend as a mere book entry in a "fictional" account. In essence, Segura asks us to assume that Associates was a sham and that all operations were allocable to Segura, personally. This we refuse to do. See generally *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949).

The record as a whole amply demonstrates that Associates was a viable and active corporate entity from 1960 until 1972. Any uncertainty in the record arising from the manner in which Associates was run or from the use of overlapping bank accounts is of Segura's own making. We find his self-serving testimony, that books, records, and Federal income tax returns spanning more than a decade were "fictional," patently incredible.

Likewise, we reject Segura's contention that a dividend paid in the form of cancellation of indebtedness cannot support transferee liability because no tangible transfer of cash or other property occurs. Segura relies on *Whitney v. Commissioner*, 26 B.T.A. 212 (1932), and *Steinle v. Commissioner*, 19 B.T.A. 325 (1930). In *Steinle*, respondent attempted to base transferee liability of shareholders on their corporation's cancellation of notes which the shareholders had given for stock. We held that no "transfer" occurred either because the notes, never having been delivered to or held by the corporation, were not the corporation's assets or because the notes simply were never canceled. See *Whitney v. Commissioner*, *supra* at 217.

In *Whitney*, the corporation-transferor had established drawing accounts for its shareholders and had made credit

---

[19]Segura contends that, if any transfers were made to him with respect to the loans receivable account, the real transfer occurred when the debt arose rather than when it was canceled. That argument has no merit. The benefits Segura received which gave rise to the debt obviously did not become a gratuitous payment or dividend from Associates until Segura's obligation to repay was erased. Thus, we have no problem concluding that the dividend was paid well after the time Associates became insolvent, while Associates was insolvent, and after the unpaid tax liability of Associates which is involved herein accrued. See generally *Kreps v. Commissioner*, 42 T.C. 660 (1964), affd. 351 F.2d 1 (2d Cir. 1965).

entries to those accounts representing salaries and profit shares. Respondent contended that those credit entries were tantamount to a dividend which was sufficient to support transferee liability against the shareholders. We rejected respondent's argument because we found that the credit entries created no actual liability of the corporation to the shareholders, and no transfer occurred.

We cannot fault Segura's argument that *Steinle* and *Whitney* clearly establish that a *mere* book entry cannot constitute a transfer. However, *Steinle* and *Whitney* do not require an actual transfer of tangible property. To constitute a dividend, a book entry appearing to reflect a transfer must be more than a *mere* book entry. In other words, so long as the book entry represents an actual reduction in the transferor's assets, it can represent a transfer of assets.

In this case, respondent has shown that the book entry canceling Segura's debt to Associates represented an actual reduction in Associates' assets with a concomitant increase in value to Segura. We are dealing with actual transfers giving rise to actual debt (see note 19 *supra*) and an actual erasure of that debt, which is much more than a *mere* book entry.

Segura also relies on *John Ownbey Co. v. Commissioner*, T.C. Memo. 1978–482, revd. on other grounds 645 F.2d 540 (6th Cir. 1981), for the sound proposition that a transfer of assets must occur. However, *Ownbey* supports respondent's position rather than Segura's. *Ownbey* clearly requires more than a mere book entry but holds that a transfer to someone else for the transferee-shareholder's benefit is sufficient to support transferee liability. Summarily stated, in order for a transfer to serve as a basis for transferee liability, there must be a reduction in the corporation-transferor's assets accompanied by a concomitant benefit to the transferee. The dividend to Segura fits precisely within that analysis.[20]

Finally, Segura contends that since he reported the $107,459.58 dividend on his 1972 Federal income tax return,

---

[20]In this case, the parties' positions would have been essentially the same if Associates had paid Segura a $107,459.58 cash dividend, and Segura had then paid a like amount to Associates to reduce his debt.

respondent should be estopped from basing transferee liability on the already taxed dividend. We disagree.[21] That contention has been rejected consistently (*Healy v. Commissioner*, 345 U.S. 278 (1953); *Stein v. Commissioner*, 37 T.C. 945 (1962); *Meyers v. Commissioner*, 21 T.C. 331 (1953)), and we see no novelty in Segura's claim.[22]

In summary, we find that Segura received a dividend of $107,459.58 from Associates, and such dividend constitutes a transfer sufficient under Louisiana law to cause Segura's liability for the unpaid tax liability of Associates.

The transferee liability asserted against petitioner Segura, Inc., is predicated on respondent's contentions that Associates transferred Camp-Cypremort Point to Segura, Inc., on January 1, 1976, for inadequate consideration, and that such transfer was made with the intent to defraud creditors. Segura, Inc., maintains that Associates never owned Camp-Cypremort Point and, thus, could not have made a transfer. We find for petitioner, Segura, Inc., for the reasons below.

On September 16, 1969, third party vendors executed a deed transferring title to Camp-Cypremort Point to Segura, Inc., petitioner Segura's wholly owned corporation. Segura, Inc., has been essentially inoperative since at least 1970.

While the deed named Segura, Inc., as vendee, Camp-Cypremort Point was an asset of Associates. The purchase price, downpayment, and notes payable were consistently treated by all involved as Associates' obligations; Associates, either directly or indirectly, paid for $10,072.62 of improvements to Camp-Cypremort Point; Camp-Cypremort Point and the improvements thereto were carried on Associates' books and

---

[21]We also find no merit in Segura's contention that respondent is generally estopped from asserting transferee liability against Segura because Segura paid deficiencies for the same time period to which the unpaid tax liability of Associates relates.

[22]Segura maintains that credit entries made to the loans receivable account after the dividend involved herein was paid constitute a full return of the dividend to Associates. While a return of transferred assets may absolve a transferee from liability based on the assets returned, *Mendelson v. Commissioner*, 52 T.C. 727 (1969); *Gobins v. Commissioner*, 18 T.C. 1159 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954), we are unable to find that Segura returned the dividend to Associates.

Once respondent has made a prima facie case of transferee liability, the burden of going forward with the proof shifts to petitioner. *Gobins v. Commissioner, supra.* Petitioner has offered us no evidence that the later credit entries represent gratuitous retransfers of previously transferred property. In fact, total debit entries after the date of the dividend exceed total credit entries after that date.

records from September 1969 until January 1976; and Associates took depreciation deductions with respect to Camp-Cypremort Point and the improvements thereto on its Federal income tax returns filed for its taxable years ending September 30, 1970, through September 30, 1975. The evidence is overwhelming that Associates was the true owner of Camp-Cypremort Point and the improvements thereto, and we so find. At best, Segura, Inc., possessed only bare legal title.

On its Federal income tax return for its taxable year ending September 30, 1976, Associates reported that Camp-Cypremort Point was transferred to Segura, Inc. Segura, Inc., for the first time listed Camp-Cypremort Point as an asset on its Federal income tax return filed for the taxable year ending September 30, 1976.

Louisiana Civil Code Annotated article 1968 et seq., provides for a revocatory action by which a creditor may have certain conveyances set aside. In general terms, before such an action may be maintained, it must be shown that the transferor is insolvent, the creditor is injured, the transfer was made to defraud the creditor, and the debt had accrued when the transfer was made. See *Perigoni v. McNiece*, 307 So. 2d 407 (La. App. 1975). We need not delve deeply into the revocatory action requirements, because we are unable to find that respondent has met his burden of proving that Associates transferred Camp-Cypremort Point to Segura, Inc.

While we agree with respondent that Camp-Cypremort Point was Associates' asset, notwithstanding the fact that legal title rested with Segura, Inc., we do not agree that Segura, Inc., received anything on January 1, 1976. In essence, respondent has not shown that Segura, Inc., ever had more than bare legal title both before and after January 1, 1976.

The record taken as a whole clearly demonstrates that Segura, Inc., has been essentially inoperative since 1970. While Federal income tax returns filed by Associates and Segura, Inc., for the taxable year ending September 30, 1976, reflect a shifting of Camp-Cypremort Point from Associates to Segura, Inc., we are not convinced that Segura, Inc., received anything. Given the entire arrangement set up between Segura, Associates, and Segura, Inc., it is as reasonable to conclude that Camp-Cypremort Point passed from Associates to Segura with legal title remaining in Segura, Inc., as it is to

conclude that Segura, Inc., received more than legal title when Camp-Cypremort Point passed from Associates.

In summary, it is impossible to ascertain exactly how Segura, Inc.'s interest in Camp-Cypremort Point changed on January 1, 1976, if at all, and therefore we are unable to find that respondent has met his burden of proving a transfer to Segura, Inc.

To reflect the foregoing and the parties' stipulation concerning the calculation of interest,[23]

*Decisions will be entered under Rule 155.*

---

[23]The parties have advised the Court that respondent has levied upon two life insurance policies owned by Associates. Prior to the levy, those policies were assigned as security for a loan to Segura. Any amount realized from such liability will be applied to Associates' unpaid tax liability and will thus reduce the liability of petitioner Segura. Any such adjustments are to be made in the computation under Rule 155.