DANIEL T. GALLUZZO AND BRONIA P. GALLUZZO, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Galluzzo v. Commissioner
Docket Nos. 3525-77, 3526-77, 3527-77, 8311-77.
United States Tax Court
T.C. Memo 1981-733; 1981 Tax Ct. Memo LEXIS 13; 43 T.C.M. (CCH) 199; T.C.M. (RIA) 81733; December 28, 1981. Richard W. Carrel, for the petitioners. Wayne Chew and Susan B. Watson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following decificiencies in and additions to the Federal income and gift taxes of the petitioners: Docket No.
Taxable Year
3525-77
1970
1971
1972
3526-77
1971
1972
8311-77
1972
Additions to Tax, I.R.C. 1954
Docket No.
Nature of Tax
Deficiency
Sec. 6651(a) [2]
Daniel T. Galluzzo and Bronia P. Galluzzo
3525-77
Income
$ 75,382.82
Income
119,333.92
Income
1,276.74
$ 319.19
Vincent Galluzzo and Angela Galluzzo
3526-77
Income
$ 97.05
Income
54.23
Daniel T. Galluzzo
8311-77
Gift
$ 34,650.00
Additions to Tax, I.R.C. 1954
Docket No.
Sec. 6653(a)
Sec. 6653(b)
3525-77
$ 37,691.41
59,666.96
$ 275.00
3526-77
8311-77
*16 The Commissioner further determined that Vincent Galluzzo was liable as a transferee of the assets of Daniel Galluzzo for the latter's 1970 and 1971 income tax deficiencies and additons to tax to the extent of $ 188,000. After concessions, [3] the issues to be decided are: (1) whether petitioner Daniel T. Galluzzo (hereinafter Daniel) earned unreported income from the illegal sale of narcotics in the following amounts: Taxable Year
Amount
1970
$ 117,369.01
1971
188,578.28
*17 (2) whether Daniel received $ 252.27 in unreported income during the taxable year 1970 in the form of drugs taken from the inventory of the company (MTL), of which he was the president and major stockholder, for which the company was never reimbursed; (3) whether Daniel received unreported income from MTL in the amount of $ 461.70 for 1970 and $ 165.51 for 1971, representing payments made by MTL for charges made on its American Express credit card by Daniel; (4) whether Daniel received income from the personal use of automobiles owned by MTL in the following amounts: Income from Personal Use
Taxable Year
of Automobile
1970
$ 1,188.70
1971
1,389.32
1972
303.44
(5) whether Daniel was entitled to a deduction for the taxable year 1972 of $ 2,250 for automobile expenses and $ 150 for parking and tolls; (6) whether Daniel was entitled to a home office deduction in 1972 of $ 893.84 attributable to his employment by Evans International Homes and $ 189.44 attributable to his employment by MTL; (7) whether Petitioner Vincent Galluzzo (Vincent) is liable as a transferee of 47 shares of MTL stock from his son Daniel during 1972; (8) whether Daniel made a *18 completed gift to Vincent to the 47 shares during 1972; (9) whether any part of Daniel's underpayments of Federal income tax for 1970 and 1971, if any, are due to fraud within the meaning of section 6653(b); and (10) whether the assessment and collection of the deficiency in and additions to Daniel's Federal income tax for any of the taxable years 1970, 1971, or 1972 is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Daniel has rasided in the State of Maryland from at least 1967 to the present. Petitioners Vincent and Angela Galluzzo resided in Baltimore, Maryland, at the time their petitions herein were filed. Daniel graduated from Loyola College and has a doctorate in Environmental Engineering from Florida State Christian College, a correspondence school. He attended Mount Vernon Law School and needs only one more credit to graduate therefrom. After graduating from Loyola in 1963, Daniel was employed by the National Security Agency. His duties there were sufficiently sensitive as to be classified. *19 Micro-Tech Laboratories (hereinafter referred to as MTL) was organized principally by Daniel with the help of Vincent, his father, for the purpose of providing analytical laboratory services to the public. MTL opened for business in June 1969. MTL was authorized to issue 100 shares of class A (voting) stock and 40,000 shares of class B (nonvoting) stock. In September 1968, the following number of subscription rights to class A stock were issued to the following persons: Subscription Rights to Class A
Stock Issued
Daniel Galluzzo
52
Vincent Galluzzo
24
Francis L. Ptak
24
These three persons were the three original directors of MTL. No certificates of MTL stock were actually issued at the time of incorporation. During the years 1970 and 1971, Daniel was the president of MTL. His brother Chris Galluzzo (Chris) was employed by MTL with the duties of maintaining the corporate books and accounts, mailing purchase orders, and buying and selling for MTL. Chris was authorized to sign checks on MTL's bank accounts. Daniel was president of MTL until May of 1972, when he resigned from that post and became a consultant to MTL. He left the employ of MTL *20 in August or September of 1972. Some time during the latter part of 1969 and the early part of 1970, Daniel applied for a permit from the Federal Bureau of Narcotics and Dangerous Drugs to purchase controlled substances. The permit was granted to Daniel, personally, as the responsible officer of MTL. Pursuant to said permit, Daniel executed the necessary forms on which various amounts of controlled substances were purchased through MTL from Loewy Drug Co. Daniel as holder of the permit was authorized and required to execute the proper forms before any controlled substances could be purchased. Daniel was the only one at MTL authorized to sign narcotics forms and his signature was necessary in order to purchase drugs. During the years 1970 and 1971 Daniel executed the appropriate forms and caused to be purchased through MTL from Loewy Drug Co. the following drugs: 1970
1971
Dilaudid
93.38 oz.
60.00 oz.
Cocaine
130.00 oz.
387.00 oz.
Cost of total purchases
$ 15,411.98    $ 18,768.45    These drugs were not used for any testing or other legitimate purpose but were diverted and sold on the illegal market. In December of 1969, Joseph *21 Catanzaro (Catanzaro) went to MTL in order to have a hair conditioner analyzed. He discussed this project with both Daniel and Chris over a number of weeks. In these conversations, Daniel and Chris mentioned to Catanzaro that they could acquire some drugs. In 1969 Daniel, Chris, and Catanzaro went to an apartment. Daniel and Chris brought some drugs with them to test for purity. The person whom they found in the apartment took the drugs from Daniel and Chris, cooked them, and then injected them into his veins. Daniel and Chris made an agreement to divert the cocaine and Dilaudid purchased as described above into illicit distribution channels. Daniel's role was to provide cover for the operation. He carried out this role by signing the purchase order forms detailed above. He further contacted Loewy Drug Co. and informed David Weiner, its general manager, that MTL would be purchasing the drugs through Federal order forms and that Chris would be picking up the drugs. Daniel usually ordered the drugs from Loewy. He would normally call Weiner, advise him of the drug he wanted to obtain, and inquire as to the quantity on hand. In fact, Daniel himself picked up the cocaine *22 and Dilaudid from Loewy Drug Co. approximately 75 percent of the time. Most of Loewy's business with MTL was conducted through Daniel. Daniel also performed laboratory tests on small amounts of these drugs in order to maintain cover for the diversion. Daniel, Chris and Catanzaro diverted the cocaine and Dilaudid from the Loewy Drug Co. via legitimate channels to the MTL laboratory and thence onto the streets of Baltimore principally through Thomas Pizza with the assistance of Chris and Catanzaro. Chris delivered drugs to Catanzaro who transferred them to a third person in exchange for money which Catanzaro would subsequently remit to Chris. Daniel and Chris were very close brothers and shared many things. During the years 1970 and 1971, Chris was providing money to Daniel for financial reasons and had money, including several stacks of $ 100 bills, in a safe deposit box. During this time period, Sharon Hansen, who directed MTL's biological laboratories, occasionally dated Chris. She exchanged small bills into hundred-dollar ones for him a number of times. When she and Chris went to the races on one occasion, she observed that Chris had six or seven hundred dollars on his *23 person. Melvin Winstead, an employee of MTL during the years 1970 through 1972, once observed Chris with a roll of money in his pocked and a pistol. On May 2, 1974, a corporation known as Three-G Fireplace Corporation was formed. The incorporators were Daniel, Vincent, and Chris. Daniel and Chris were co-owners of this corporation and of another, Baltimore Fireplace Corporation. On one occasion, Chris purchased a 17-foot-long sailboat and gave it to Daniel. On July 19, 1972, Daniel and Chris executed a document, the terms of which provided that Daniel assigned Chris one-half of Daniel's rights under an agreement reflected in another document bearing the same date. The latter agreement provided that Daniel thereby transferred 47 shares of his MTL stock to Vincent and that Vincent was to pay two-thirds of the proceeds of any sale of this stock to Daniel, retaining one-third for his efforts in managing the stock before its sale. On one occasion Daniel and Chris arranged to have a detective take pictures while Chris caused Daniel's ex-wife to have sexual relations. This was arranged by Daniel and Chris to influence the outcome of a child custody fight. The substantial *24 amounts of money that Chris had earned from the sale of the cocaine and Dilaudid were held for him in the names of, or had been buried for him by, other persons for the purpose of concealing them from the Commissioner during his examination of Chris's Federal income tax liability. Chris also stashed some of the profits in Swiss bank accounts so that they could not be traced. On September 7, 1972, Daniel and Chris were indicted by a Federal Grand Jury for violations of various narcotics laws. On September 8, 1972, they both pleaded not guilty to the indictment. On November 21, 1972, however, they changed their pleas to guilty. On October 26, 1973, the indictment was dismissed and a superseding Information charging conspiracy to sell narcotics in violation of 18 U.S.C. sec. 371 was filed against them. That same day, Daniel voluntarily pleaded nolocontendere and in the alternative guilty to the Information. In doing so, he acknowledged that he was in fact guilty of the offense charged in the Information. The court accepted the plea of nolocontendere. The cocaine sold to MTL by Loewy Drug Co. and then illegally diverted was pharmaceutically *25 pure. Revenue Agent Martin Furman determined that Daniel had income from the illegal sale of the cocaine and Dilaudid of which he had kept no records. Furman determined that Daniel and Chris were equal joint venturers in wholesaling these drugs. He accordingly determined that Daniel was chargeable s a partner in this venture with 50 percent of the net income from the sale of the drugs at the wholesale level. In making the determination that Daniel was a joint venturer in the procurement and illegal marketing of the cocaine and Dilaudid, Furman talked to Daniel, Chris, Catanzaro and Tom Pizza (the four co-conspirators) and the various United States Attorneys involved. He also spoke with personnel of the Bureau of Narcotics and Dangerous Drugs, of the Baltimore County police, and of the Loewy Drug Co. He traveled to the Court of Appeals in Richmond, Virginia, to view many of the documents in evidence in the trial of those connected with the conspiracy. Furman attended all of the trials of the conspirators as well as the sentencing of Daniel and Chris. Furman's investigation persuaded him that Daniel had contributed to the furthering of the conspiracy in a very active way. Furman *26 discovered that Daniel signed all of the purchase orders for the cocaine and Dilaudid, that he picked up some of the drugs from Loewy Drug Co., and that he, Chris, and Catanzaro went to the apartment to determine the quality of the drugs. Furman believed from the evidence before him that Daniel applied for the Federal permit to purchase controlled substances principally to effectuate the illegal diversion and that on several occasions Daniel and Chris visited with Thomas Pizza to discuss the operation. Furman also based his inclusion of Daniel as a partner in the wholesale enterprise upon the fact that Daniel and Chris shared practically everything they did of any significance. He discovered Daniel's assignment to Chris of one-half of his interest in the proceeds of the sale of MTL stock (described above), Daniel's and Chris's joint participation in Three-G Fireplace Corporation and Baltimore Fireplace Corporation, and their mutual involvement in Daniel's custody battle. Because they appeared to work together in all of their other activities, Furman saw no reason to believe that they were not sharing the earnings from the narcotics sales. In determining the amount of income *27 earned from the sale of the illegally diverted narcotics by Daniel and Chris, Furman used a price of $ 775 per ounce of cocaine and $ 1,600 per ounce of Dilaudid. Furman contacted several agents from the Drug Enforcement Administration (formerly the Bureau ofNarcotics and Dangerous Drugs) and officers of the Baltimore County Police Department. He talked with all of the parties involved in the diversion and received a letter from the Justice Department, Bureau of Narcotics and Dangerous Drugs. Furman obtained two sets of price figures from this investigation--wholesale and retail prices. Although he felt that he would have been justified in using the highest wholesale figures he had obtained in view of the drugs' pharmaceutical purity, he averaged the high and low wholesale figures. In so doing, Furman also took into account the potential price discount which might result from high-quantity sales of narcotics to a single retailer. Michael J. Agnese is presently a group supervisor with the Drug Enforcement Administration, Department of Justice (DEA), assigned to the Baltimore area. He has been employed by the DEA and its predecessors since 1966. He has worked in Baltimore since *28 1968. He has attended basically all of the drug enforcement schools of the DEA and its predecessors, including schools on drug identification, law familiarization, management, and training in various categories of drug enforcement. The DEA and its predecessors also continuously conduct on-the-job training programs relating to familiarization with new procedures and changes in the pattern of abuse of a given drug. Over the years, Agent Agnese had participated in thousands of drug investigations, including several hundred in 1970 and 1971, in the course of which he personally purchased and/or assisted in the purchase of both Dilaudid and cocaine. Agent Agnese did not, however, make any purchases of drugs that came from MTL andhence has no personal knowledge of their wholesale or retail price. Agent Agnese was the supervisor during the preparation and trial of the criminal cases arising from the illegal diversion of cocaine and Dilaudid now before this Court. It is Agent Agnese's opinion that, in the Baltimore area during 1970 and 1971, the illegal wholesale price of the ounce of pharmaceutically pure Dilaudid was approximately $ 1,100 to $ 1,200 and that the illegal wholesale *29 price of an ounce of pharmaceutically pure cocaine was $ 900 to $ 1,000. To arrive at the net income which Daniel and Chris received from their joint venture, Furman subtracted from the gross sales of the cocaine and Dilaudid at wholesale, as he had calculated it, the cost of the drugs as paid by MTL to Loewy Drug Co. During the year 1970 drugs valued at $ 504.53 were withdrawn by Daniel and Chris from the inventory of MTL and never restored. MTL was never repaid for this withdrawal. During the years 1970 and 1971, MTL paid various expenses incurred by Daniel as reflected on bills paid to the American Express Company on MTL's American Express credit card. The amounts paid in this manner totaled $ 461.70 for 1970 and $ 165.51 for 1971. Various automobile expenses incurred by Daniel were paid by MTL for his use of company cars as follows: Years Incurred
Type of Expenses
Incurred
1970
1971
1972
Gas and Oil
$ 792.70
$ 978.32
$ 303.44
Depreciation
249.00
89.64
Insurance
147.00
Repairs
321.36
TOTALS
$ 1,188.70
$ 1,389.32
$ 303.44
During the years 1970 and 1971, MTL owned vehicles that were for the use of company officials. During *30 these years Daniel had access to and utilized these vehicles. MTL maintained no records of the business use of these cars for the years 1970 through 1972. Neither Daniel nor any other corporate officers kept a diary of their business use of the cars. Daniel, Chris and Vincent Galluzzo used the cars for their personal purposes as well as for MTL's business purposes. During the latter part of 1972, Daniel was employed as a sales representative by Evans International (Evans), a prefabricated him builder. Daniel claims for this period, as employee business expenses, $ 2,250 as automobile expense and $ 150 for parking and tolls. His duty was to sell prefabricated housing packages to individuals and contractors in Maryland, Virginia, Delaware, the District of Columbia, and parts of West Virginia and Pennsylvania. Daniel would contact potential customers and then drive out to talk with them in his personal automobile. Daniel did not maintain a diary or any other records of the use of his automobile in his trade or business as an employee of Evans. Evans had no office in Daniel's sales territory but operated solely through Daniel as its sales representative. Daniel used a portion *31 of his apartment in Cockeysville, Maryland, as his office in conducting his trade or business as an employee of Evans. After resigning as president, Daniel served as a consultant to MTL from May through August or September of 1972, as noted supra at 6. During this time he had his family were living in his parents' home along with Chris. As president of MTL, Daniel was provided with a large, attractive office. However, when he became a consultant, he had to move from that office into a very small cubicle where cleaning equipment was stored. Daniel used the telephone in his apartment to make business calls, both local and long distance. He submitted, however, no records to the Commissioner, nor has he submitted any to this Court, which substantiate either the total amount of rent, telephone, and utility expenses he incurred during 1972 or the portion of these expenses allocable to his home offices. There is accordingly no evidence from which these expenses can be determined. Daniel claimed, on his 1972 Federal income tax return, home office deductions of $ 893.84 with respect to his employment with Evans and $ 189.44 with respect to his employment with MTL. In 1972 Daniel *32 owned subscription rights to 47 shares of class A MTL stock. As of May 1972, Daniel had decided to transfer the shares to his father. At that time, MTL was considering registering its stock with the Securities Exchange Commission and selling it publicly. Due to the investigation of MTL's narcotics purchases, Daniel's implication therein, and his desire to assist such investigation, he found it necessary to withdraw from MTL to protect the rights of the other shareholders. In fact, the underwriters who had been handling the public offering of MTL's stock rejected the offering upon learning of the narcotics entanglement. Vincent was the person connected with MTL whom Daniel most trusted to represent his stock. Daniel transferred these subscription rights to Vincent for no monetary consideration. The transfer rendered Daniel insolvent and without assets with which to pay the asserted deficiencies in and additions to his 1970 and 1971 Federal income taxes. The agreement was signed by both Daniel and Vincent and its pertinent parts provided as follows: THIS AGREEMENT OF SALE OR TRANSFER OF CORPORATE STOCK, Made this 19 day of July 1972, by and between DANIEL T. GALLUZZO, of the *33 first part, hereinafter called "SELLER", and VINCENT C. GALLUZZO, of the second part, hereinafter called "BUYER". WITNESSETH, That in consideration of the premises and the mutual promises of the parties hereto, it is understood and agreed by and between the parties hereto as follows: 1. SELLER, subject to the terms and conditions of this Agreement, hereby transfers, assigns and sets over unto BUYER all his right, title and interest in and to 47 shares of Class A, Voting Stock of the MTL Industries, Inc., as represented by Certificate(s) No. 3. 2. BUYER hereby agrees to pay for said Stock unto SELLER upon such terms and arrangements as hereinafter will establish the value of said Stock as may be determined at a future date. It is understood and agreed that BUYER will hold, vote and control such Stock in Trust for SELLER until such time as BUYER receives a bona fide offer for the purchase of said stock, which offer BUYER elects to accept or in the event of recapitalization and registration of the securities with the Securities Exchange Commission and thereafter there are sufficient sales and bids to determine the value of said stock and the bid price for said stock is available *34 unto BUYER as a means of establishing its value, then BUYER agrees to pay unto SELLER the said established price less Thirty-Three and One-Third Percent (33 1/3%) for the handling of this Trust arrangement for purchasing the stock and voting the stock and for other services heretofore rendered by BUYER unto SELLER. This transfer of subscription rights was authorized by MTL's Board of Directors. On July 19, 1972, MTL issued 47 shares of its stock to Vincent. Sometime before November 13, 1972, Vincent conferred with Theodore S. Kaplan, an attorney, concerning the legal implications of placing his 47 shares of MTL stock into a trust. A letter from Mr. Kaplan follows: November 13, 1972 Mr. Vincent Galluzzo, MTL Industries, Inc., 1025 Cromwell Bridge Road, Towson, Maryland 21204 Dear Chris: In connection with our prior discussions concerning the possibility of placing your MTL shares into a trust, we have prepared preliminary draft copies of a Trust Agreement to cover this situation. For tax reasons, if it is decided to enter into trust arrangements on your MTL shares, we would propose that you first make a gift of one-half of your shares to Mrs. Galluzzo, and she will *35 then put her shares into a trust. Her Trust Agreement would be identical to the one which I have enclosed with this letter. Under both trusts you would have all of the voting powers over the MTL stock while you are alive. Also, you should note that we have not included language to cover the question of who would be the trustees after you. This language would be included on the third page. Because we are counsel for the Company and have been asked to prepare trusts in the Company's behalf, we wish to advise you that we believe it is important that you confer with your individual attorney to review the Trust Agreement. After you have done this, we will want to get together with you and your attorney to discuss this matter. Best regards. Sincerely yours, /s/ Theodore S. Kaplan On or about March 14, 1973, a deed of trust was drawn up and executed wherein Vincent transferred the 47 shares of MTL stock which he had received from Daniel to a trust, the pertinent terms of which provide as follows: THIS DEED OF TRUST, executed in duplicate this 14th day of March, 1973, by and between VINCENT GALLUZZO, of Baltimore County, State of Maryland, hereinafter called "Grantor", and *36 VINCENT GALLUZZO, of Baltimore County, State of Maryland and CALVERT E. HARTMAN, of Harford County, State of Maryland, hereinafter called "Trustees". WHEREAS, the Grantor desires to establish a trust of all of his Class A voting common stock of MTL Industries, Inc., a Maryland corporation. NOW, THEREFORE, THIS DEED OF TRUST WITNESSETH, that * * * the Grantor does hereby transfer, assign and deliver unto the Trustees all right, title and interest in and to his forty-seven (47) shares of the Class A voting common stock of MTL Industries, Inc. Delivery of the Stock Certificates, property endorsed, is a condition precedent to the execution of this Deed of Trust. FIRST: The Trustees * * * shall dispose of the income and principal of this trust estate as follows: (a) The Trustees shall pay to the Grantor the entire net income from this trust estate, in as nearly equal quarterly or such other convenient installments as may be practicable, until the termination of this trust estate as hereinafter provided. From and after the death of the Grantor prior to the termination of this trust estate, the Trustees shall pay to the Grantor's wife, Angela Galluzzo, the entire net income *37 from this trust estate, in as nearly equal quarterly or such other convenient installments as may be practicable, until the termination of this trust estate as hereinafter provided. From and after the death of the survivor of the Grantor and his said wife, the Trustees shall pay the entire net income from this trust estate, in as nearly equal quarterly or such other convenient installments as may be practicable, until the termination of this trust estate as hereinafter provided, to the Grantor's descendants living at the time of such payments, per stirpes. To the extent that any part of the principal of this trust estate shall, at any time, be comprised of assets other than the voting stock of MTL Industries, Inc., the Grantor if then acting as a Trustee hereunder, otherwise the successor Trustee acting in his place and stead pursuant to the provisions of Paragraph FOURTH (a) below, shall have the sole and absolute right to pay over and deliver to the person or persons then entitled to receive the income hereunder, such part or all of such assets other than the voting stock of MTL Industries, Inc., as the Grantor or his successor to act as Trustee, in his or her sole and absolute *38 discretion, shall determine from time to time, and for such purpose or purposes as such Trustee, in his or her sole and absolute discretion, shall determine.
(b) This trust estate shall terminate upon the first to occur of the following: (i) When the voting stock of MTL Industries, Inc. comprising any part or all of this trust estate together with any voting stock of MTL Industries, Inc. owned by the Grantor's wife, Angela Galluzzo, and/or the Grantor's descendants or held for the benefit of the Grantor's said wife or the Grantor's descendants, shall be less than ten percent (10%) of all of the issued and outstanding voting stock of MTL Industries, Inc.; or (ii) The death of the survivor of the Grantor's sons, Daniel T. Galluzzo and Christopher G. Galluzzo. Upon the first to occur of the foregoing, this trust estate as then constituted, shall be distributed, absolutely, to the Grantor, if then living, otherwise to those person or persons, in such proportions and subject to such trusts, powers and conditions, as the Grantor may declare and appoint by his Last Will and Testament. If the Grantor shall die prior to the termination of this trust estate, and shall fail to exercise *39 the testamentary power of appointment hereunder reserved by him, or to the extent that such power of appointment shall not be validly exercised by him, then upon such termination, this trust estate, as then constituted, shall be distributed absolutely to the Grantor's then living descendants, per stirpes, if any, otherwise to those persons who would have been the distributees of the Grantor, had he then died intestate, domiciled in the State of Maryland. FIFTH: In addition to and not in limitation of the powers conferred by law, the Trustees are authorized and empowered in the administration of the trust estate hereby created as follows: (b) To invest, reinvest and change the investments of the trust estate from time to time, * * * and for such consideration and on such terms as to them shall seem proper, to buy, sell, assign, transfer, bargain, convey * * * and in any other manner conditionally or absolutely to dispose of all or any part of the trust property whenever and as often as they may deem it advisable or proper so to do, * * * provided, however, that in no event shall the voting stock of MTL Industries, Inc., comprising any part or all of the trust be sold, assigned *40 or otherwise transferred directly or indirectly to the Grantor's sons, Daniel T. Galluzzo and/or Christopher G. Galluzzo. (e) To exercise all conversion, subscription, voting and other rights of whatsoever nature pertaining to the trust property; * * * to consent to and participate in any plan of reorganization, consolidation, merger, combination or other similar plan, and to consent to any contract, lease, mortgage, purchase, sale or other action by any corporation pursuant to such plan; provided, however, that in no event shall the voting rights attaching to the stock of MTL Industries, Inc., comprising any part * * * of the trust, be exercised in such manner as would permit the election of * * * Daniel T. Galluzzo and Christopher G. Galluzzo, as director and/or officers of said company. (m) To do all such acts, take all such proceedings and exercise all such rights and privileges, although not hereinbefore specifically mentioned with relation to the trust property, as if the absolute owners thereof, and in connection therewith, to enter into any covenants or agreements binding the trust estate created hereunder. Notwithstanding the foregoing provisions of this Paragraph *41 FIFTH, all powers and rights in the administration of the trust estate hereby created (including, but not limited to, the voting rights attaching to the stock of MTL Industries, Inc., comprising any part or all of the trust estate) shall be exercised solely by the Grantor if acting as a Trustee hereunder, otherwise by the successor Trustee acting in his place and stead pursuant to the provisions of Paragraph FOURTH (a) above. Subsequent to 1972 MTL's stock was recapitalized by combining the class A and class B stock into one class of common voting stock. This stock was, in August 1974, exchanged for stock in Omni Research, Inc., pursuant to the latter's agreement to purchase MTL. Under the terms of the purchase agreement, Omni retained options to repurchase its stock used in the exchange. Omni exercised its option to repurchase the Omni shares held by Vincent C. Galluzzo in 1976 for $ 10,476. On their return for the taxable year 1976, petitioners Vincent and Angela Galluzzo reported as gross income an item of $ 2,625. Attached to the return was the following explanation: Amount received on or about October 15, 1976, in full and final settlement from Daniel T. Galluzzo *42 for performing services rendered under an agreement dated July 19, 1972. $ 2,625.00 On their 1976 return, petitioners Daniel and Bronia P. Galluzzo reported the following long-term capital gain: Kind of Property & Description: 3,492 shares Omni Research Inc. Common Stock Date Acquired: 1968 Date Sold: 9/27/76 Gross Sales Price:
$ 10,476.00
Cost or Other Basis:
3,072.34
Gain or (Loss):
$ 7,403.66
No deduction was taken for any amount paid over to Vincent Galluzzo. When Revenue Agent Furman first met with Daniel regarding Daniel's 1970 and 1971 Federal income tax returns in December of 1972, Daniel claimed that he was completely innocent of any involvement in the conspiracy to illegally procure and sell narcotics. When asked by Furman why, if he were innocent, he had, on November 21, 1972, pleaded guilty to the Federal Grand Jury indictment (supra at 9-10), Daniel's response was that the charge and plea was a technical maneuver designed to convince the judge and jury in the related trials of Thomas Pizza and Sol Gumpircht, in which Daniel testified as a government witness, that he was indeed part of the conspiracy. Yet, Daniel freely acknowledged *43 at his sentencing on October 26, 1973, that he was in fact guilty of involvement in the conspiracy. In mid-1972, when Furman first met with Daniel, Furman asked Daniel about his ownership of MTL stock. Daniel indicated to Furman that he had sold 5 of his 52 subscription rights to one Paul Russo and transferred the remaining 47 to Vincent. In early 1973, Furman specifically asked Daniel whether he had sold any of his stock. Daniel indicated that he had sold 5 shares and still owned the rest.In May of 1973, Daniel was asked at the trial of Thomas Pizza whether he had any interest in MTL any longer. Daniel answered "no sir" and indicated that he had divested himself of any interest in the company and resigned. Subsequent to the Pizza trial, Daniel presented to Furman a copy of the July 19, 1972, agreement between Daniel and Vincent (described supra at 16-17) and informed Furman that he still had title to the stock. Then, in August of 1973, at the trial of Sol Gumpircht, Daniel testified that prior to his indictment in September 1972 (supra at 9) he "had resigned from the company and sold [his] stock and devoided [him]self from anything in the company." For the years *44 1970 and 1971, Daniel maintained no records of any of his income from the illegal sale of narcotics or of his personal and business use of the automobiles owned by MTL and used by him. With respect to the deductions for automobile expense and parking and tolls claimed by Daniel for 1972 (supra at 14), Furman asked Daniel in May 1974 where his records substantiating these deductions were and how they were calculated. Daniel replied that all of these records were at his accountant's office and that the accountant had determined the amounts of these expenses therefrom. In March 1974, however, Furman had visited the accountant's office and had found no records of these expenses nor any indication of how they had been calculated.
With respect to Daniel's claimed home office expense deductions in 1972, Furman asked Daniel in May 1974 the whereabouts of records substantiating the total amount of rent, telephone, and utilities expense. Daniel's reply was that his accountant had these records. Furman had found out that the accountant did not have any records substantiating these expenses. Nor was there any indication as to how the percentages of these total amounts which Daniel *45 allocated to his home office were determined. During the audit of his 1970 and 1971 returns, Daniel stated to Furman that he had borrowed between $ 1,400 and $ 1,500 from a Robert Bonsall. Bonsall in fact never lent any money to Daniel. During the course of the audit, Daniel indicated to Furman that Chris had lent him (Daniel) the money with which to purchase the boat which in fact was a gift from Chris (supra at 9). Daniel was polite with Furman during the audit but not cooperative.Daniel provided Furman some of his cancelled checks written during the years in issue but not all of them. Daniel explained to Furman that the records were incomplete because he was undergoing a separation from his wife and was unaware of what she had done with the remainder of the checks. Furman discovered, however, that Daniel's wife had abruptly left the house without her clothes or personal belongings, possibly because she had been thrown out, and returned with a policeman the next day to retrieve them. She found them packed in a suitcase sitting on the front lawn. For his taxable years 1970, 1971, and 1972, Daniel filed Federal income tax returns with the Commissioner. The 1970 and *46 1971 returns were filed on or before April 15, 1971, and April 15, 1972, respectively. The 1972 return was not filed until March 12, 1974.The Commissioner and Daniel executed agreements in writing purporting to extend the period for assessment with respect to the taxable years 1970 and 1971 as follows: Extension of Period for Assessment for: Date of Agreement
1970
1971
November 20, 1973
To April 15, 1975
March 21, 1975
To April 15, 1976
March 16, 1976
To October 15, 1976
June 4, 1976
To anytime on or
To anytime on or
before the 90th
before the 90th day
day following (1) the
following (1) mailing of
mailing of statutory
statutory notice or
notice or (2) Receipt
(2) Receipt of taxpayer's
of taxpayer's election
election to
to terminate agreement
terminate agreement
The statutory notices of deficiency with respect to Daniel's 1970, 1971, and 1972 taxable years were mailed January 10, 1977, to Daniel's last known address. The Commissioner determined: (1) that Daniel earned unreported income from the illegal sale of narcotics as indicated supra at 3; (2) that Daniel received $ 252.27 in unreported income during *47 1970 in the form of drugs taken from MTL's inventory which were never restored and for which MTL was never reimbursed; (3) That Daniel received unreported income from MTL of $ 461.70 in 1970 and $ 165.51 in 1971 as a result of MTL's payments of charges made to its American Express card account by Daniel; (4) that Daniel received income from personal use of MTL's automobiles as detailed supra at 14; (5) that Daniel was not entitled to deduct the $ 2,250 for automobile expenses and $ 150 for parking and tolls which he had claimed for 1972; (6) that Daniel was not entitled to any home office deduction for 1972; (7) that Vincent is liable to the extent of $ 188,000 for the deficiencies in and additions to Daniel's Federal income tax for the taxable years 1970 and 1971 as a transferee of Daniel's MTL stock within the meaning of section 6901; (8) that Daniel made a completed gift in 1972 of the 47 shares of MTL stock which he transferred to Vincent pursuant to the July 19, 1972, agreement; and (9) that part of Daniel's underpayments of Federal income tax for 1970 and 1971 were due to fraud within the meaning of section 6653(b). OPINION Issue 1. Income From Illegal *48 Drug Sales
The facts relevant to this issue are fully set forth in our findings of fact. Basically, Daniel, Chris, Joseph Catanzaro, and Thomas Pizza formed a conspiracy to purchase drugs legally from Loewy Drug Co. through MTL and then sell them illegally. The Commissioner determined, and respondent contends, that Daniel and Chris formed a partnership or joint venture for purposes of Federal income tax law to purchase the drugs from Loewy and then sell them at wholesale prices to Catanzaro and Pizza who retailed them on the streets of Baltimore. Daniel is, therefore, in respondent's view, chargeable with one-half of the net income from the wholesaling the narcotics as his partner's distributive share under section 704. Daniel naturally contends that he did not participate in the profits from the venture in any way and that his role was limited to merely signing Treasury order blanks.
Respondent's partnership theory, properly conceived, is not an oppressive technicality designed to charge hapless taxpayers with phantom income, but is merely a restatement and specific application of the venerable principle that income must be taxed to him (or her) who earns it. Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); *49 Lucas v. Earl, 281 U.S. 111, 114-115 (1930). Thus, one who contributes absolutely nothing to a joint venture's business enterprise cannot be taxed on any of its income. Culbertson, supra at 739.
Section 7701 provides: SEC. 7701. Definitions. (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof-- (2) PARTNERSHIP AND PARTNER.--The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. Section 761(a) contains identical language but applies only to subtitle A. The status of an arrangement among the parties under state law is not controlling for purposes of Federal law. The Internal Revenue Code prescribes its own standards for qualification of an unincorporated organization as a partnership and supersedes local law. Commissioner v. Tower, 327 U.S. 280, 287-288 (1946); *50 Estate of Kahn v. Commissioner, 499 F.2d 1186, 1189 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Luna v. Commissioner, 42 T.C. 1067, 1077 (1964). A partnership is created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. In determining the existence of a partnership for Federal income tax purposes, the question is whether, considering all of the facts, the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits and losses or both. Commissioner v. Culbertson, supra at 741-742, 744-745; Commissioner v. Tower, supra at 286-287. The issue is a factual one. Luna v. Commissioner, 42 T.C. 1067, 1077 (1964). Among the factors to be considered are whether an alleged partner's contributed services are vital and essential to the partnership's successful operation and whether he or she shares in the management and control of the business. Culbertson, supra at 744 and n. 14; *51 Tower, supra at 290; Luna, supra at 1077-1078; Felix v. Commissioner, 12 T.C. 933, 940 (1949). There need be no written agreement; a partnership or joint venture may be created orally or implied from the conduct of the parties.Felix, supra at 941. We conclude that the objective evidence in the case before us clearly establishes that Daniel and Chris were partners or joint venturers in the procurement and illegal sale of the narcotics. Daniel's participation in the scheme was much more than tangential. Daniel personally applied for and was granted the permit from the FBNDD to purchase controlled substances. He signed the order forms; unless he had done so, no drugs whatsoever could have been procured from Loewy. He and Chris initially suggested to Catanzaro the possibility of obtaining drugs. He accompanied Chris and Catanzaro to an apartment where a man tested the purity of drugs which Daniel and Chris brought along. Daniel, more often than Chris, ordered and picked up the drugs from Loewy and made inquiries of David Weiner, Loewy's general manager. Daniel provided cover for the operation by performing laboratory tests on small amounts *52 of the cocaine and Dilaudid. Daniel and Chris were very close brothers and cooperated and shared in other ventures, including the formation of Baltimore Fireplace and Three-G corporations. Chris provided money to Daniel during 1970 and 1971, and gave him a sailboat. Daniel assigned to Chris one-half of his rights in Daniel's July 19, 1972, agreement with Vincent. They even teamed up to influence the outcome of Daniel's child custody controversy. This high degree of cooperation in other activities tends to show that they also jointly participated in the drug diversion. It is important to bear in mind that Daniel has the burden before this Court to prove that the Commissioner's determination that he was a partner with Chris in the criminal enterprise is erroneous. [4]Welch v. Helvering, 290 U.S. 111 (1933). This Daniel has failed to do. The evidence shows that he was an integral part of the conspiracy, contributing thereto "vital, important, and essential services * * * during the period in question." Felix, supra at 940. Daniel at trial vociferously asserted his lack of serious involvement in the venture. He claims that his only role was to sign the *53 blank order forms and give them to Chris to procure the drugs. His testimony, however, is so permeated with self-serving inconsistency as to be entitled to almost no weight. For example, we find the following testimony at page 117 of the transcript: Q. Did you have an agreement with your brother to divert these drugs? A. No. Positively not. Daniel testified as follows in the Thomas Pizza trial: Q. Mr. Galvin, * * * did there ever come a time when you formed an agreement with anyone concerning the diversion of the cocaine and dilaudid you were purchasing from Loewy Drugs *54 into illegal purposes? THE WITNESS: Yes, sir. Q. And who was that agreement made with? A. My brother. Daniel's testimony in the Sol Gumpircht trial was as follows: Q. All right, so then as a result of these contacts by Thomas Pizza, you then entered into an agreement with your brother, where you would sign the slips? A. Yes, sir. Q. And your brother would then pick up the narcotics? A. Yes, sir. Daniel also points to the fact that there was no direct testimony that he was receiving money from the sale of the drugs. This argument, however, misconceives the burden of proof. It is not respondent's burden to show that Daniel earned the income attributed to him; it is rather Daniel's burden to show by a preponderance of the evidence that he didnot earn the income. Aside from Daniel's questionably credible testimony, all the evidence points to his material participation in the narcotics diversion. We uphold the Commissioner's determination that Daniel was a partner or joint verturer with Chris in the wholesaling of the cocaine and Dilaudid, [5] earning through the contribution of his vital services a 50 percent share of the net income therefrom. *55 Petitioner further contends that even if he did participate in the diversion as a joint venturer, "[r]espondent has not demonstrated by any testimony what profits were made * * *." We again emphasize that it is not incumbent upon respondent to prove the exact amount of income derived from the illegal enterprise. It is incumbent upon petitioner to show that the Commissioner's determination of net income was erroneous. Petitioner cannot accomplish this merely by picking at the testimony of respondent's expert witness. He must present his own evidence as to what the net income was. This he has not done. It ill lies in the mouth of one who fails to maintain or produce any records of his or her *56 business income to complain of imprecision in the Commissioner's reconstruction thereof. The evidence shows that in determining the wholesale price of the cocaine and Dilaudid, Revenue Agent Furman was very fair, consulting many different sources and accounting for the possibility of "volume discounts." It fact, he subtracted from the calculated sales figure the cost of the drugs to MTL and attributed only the net amount to Daniel and Chris.However, it is certainly arguable, although respondent does not assert, that MTL's payments for the drugs constituted dividends to Daniel. We accordingly sustain the Commissioner's determination that Daniel and Chris were equal partners in the criminal enterprise and his determination as to the amount of income earned by Daniel therefrom. Issue 2. Daniel's 1970 Income From Removal of Drugs From MTL's Inventory
Petitioners introduced no evidence to rebut the Commissioner's determination that Daniel received unreported income in 1970 of $ 252.27 arising from his removal of drugs from MTL's inventory without reimbursing MTL or restoring the drugs. This determination is accordingly sustained. Issue 3. American Express *57 Card Charges
Daniel introduced no testimony or other evidence regarding the American Express Card charges paid by MTL. Daniel testified that he was "reimbursed" by MTL in 1970 a total of $ 469.08 for such expenses as "travel and tolls," "stationery and staples," "parking," and a phone deposit. This testimony apparently does not relate to the American Express charges because these are not the sort of expenses which would be charged on a credit card. Also, one is not "reimbursed" for an expense when he or she charges it to another's account and the other person then pays the charge. One is "reimbursed" when one initially pays for an expense from one's own funds or credit and is then directly repaid by the person on whose behalf the expenditure was made. We accordingly infer that Daniel was referring in his testimony to expenditures which he had made from his own assets and for which he was subsequently repaid by MTL and not to the charges he made to MTL's American Express account. Daniel has presented no evidence as to these charges and, therefore, he has not carried his burden of proof. Accordingly, we sustain the Commissioner's determination that Daniel received unreported *58 income from MTL of $ 461.70 in 1970 and $ 165.51 in 1971 due to these credit card charges. Issue 4. Income From Personal Use of MTL's Cars
Daniel had access to MTL's automobiles for both personal and business use during 1970 through 1971. However, neither her nor any other MTL employee maintained any records of the automobile's business use. Daniel vaguely testified at trial that he used the vehicles only in the course of MTL's business and not for his personal purposes. However, on cross-examination, he admitted that he took the cars home "often" and claimed that he maintained a diary or log of his business use of these cars. Yet, revenue agent Furman was presented with no such records during his examination. No explanation has been offered for this. We find that Daniel's testimony here is contradictory and simply unbelievable. It is clear that no records were kept of business use and that while there was undoubtedly some business use of the automobiles by Daniel, it is impossible for us to arrive at any rational estimate as to the extent of such use and thus we are unable to apply the rule of Cohan v. Commissioner, 39 F.2d 540, 543-544 (1930). *59 We accordingly sustain the Commissioner's determination on this issue. Issue 5. Deduction in 1972 of $ 2,250 in Automobile Expenses and $ 150 for Parking and Tolls
Daniel claimed these deductions in connection with his employment by Evans International during 1972. At trial, Daniel testified that he maintained a diary or log of his automobile expenses. He did not produce this log. During the audit of his 1972 return, however, he indicated to revenue agent Furman that he did not maintain a diary of these expenses but that his accountant had all of "the records" and used them to arrive at the deducted amounts. Furman had been to the accountant's office and was allowed to see Daniel's files. He had found there neither "the records" nor any indication as to how the deducted amounts were determined. Daniel submitted in evidence several dozen pieces of paper on which are written the names and addresses of various people. Across from some of the names are numerical mileages, e.g., "130 mi." Across from a few others are dates but no mileages. Some of the sheets contain at the top the words "Sent Cat." followed by a date. Across from four of the names appear both mileages *60 and the date "11/27/72." The total mileage listed with these four names is 457 miles. At trial, Daniel testified that this was a log of the people he had visited in 1972 in the course of his employment with Evans International and of the round-trip mileage from his apartment to the listed addresses and return. He testified that he wrote the mileages either directly after the appointment or at the end of the day of the appointment. However, on voir dire examination he further testified as follows: A. That's the total mileage, or a computation of the average mileage of a month or two or whatever * * *. On the strength of the ambiguity permeating both the alleged "log" and the testimony concerning it, we are unable to conclude that it substantiates much of anything. Most of the entries are undated; much of the document seems merely to be a list of people to whom catalogues were sent. Even with respect to the four entries with both dates and mileages, it is difficult to believe that in one day (November 27, 1972) Daniel made four round-trips totaling 457 miles from his apartment in Cockeysville to the indicated addresses. Again, there is no credible testimony from which *61 we can make an approximation of the business as opposed to personal use which Daniel made of his automobile in 1972 during the time he worked for Evans International. We must sustain the Commissioner's determination as to this issue. Issue 6. Daniel's Home Office Deductions for 1972
Daniel resigned as MTL's president in May 1972 and became a consultant to that company in which capacity he served until August or September 1972. In connection with his resignation and new position, Daniel moved from his spacious executive office to a small cubicle. Daniel claimed that, during this period of time, he used a portion of his residence in connection with his position as a consultant to MTL. During this time he and his family were living in his parents' home along with Chris. Daniel claimed that he used 25 percent of the house for his trade or business but did not produce to the revenue agent, and has not produced to this Court, any record of the rent, telephone charges, or utility charges which he was required to pay while residing there, if any.
A trade or business expense deduction is available only to one who actually incurs a cost which meets the requirements of deductibility. *62 As Daniel has not shown that he incurred any costs while residing at his parents' home, we sustain the Commissioner's disallowance of the $ 189.44 home office deduction claimed by Daniel for 1972 in connection with his employment by MTL. A similar result must apply to the $ 893.84 home office expense which Daniel claimed for 1972 in connection with his employment by Evans International. Daniel has produced no evidence of the amount of rent, telephone or utility expenses he incurred with respect to his Cockeysville apartment. We are accordingly unable to allow any of the claimed $ 893.84 home office deduction. Issue 7. Transferee Liability of Vincent
Section 6901 provides as follows: SEC. 6901. TRANSFERRED ASSETS. (a) METHOD OF COLLECTION.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) INCOME, ESTATE, AND GIFT TAXES.-- (A) TRANSFEREES.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer *63 in the case of a tax imposed by subtitle A (relating to income taxes) * * * Section 6901 does not create transferee liability but merely provides a procedure for respondent to collect from a transferee the unpaid tax liability of a transferor. Segura v. Commissioner, 77 T.C. 734 (Sept. 30, 1981). Whether a transferee of property is liable for the transferor's indebtedness is determined under the laws of the state in which the property transfer occurred. Commissioner v. Stern, 357 U.S. 39, 42 (1958). The evidence shows that, in 1972, Daniel transferred sub-scription rights to 47 shares of MTL stock to Vincent under an agreement that, upon either (1) the eventual sale of or (2) the establishment of a market price for the stock, Vincent would pay to Daniel the total sales or market price for the shares less one-third of such price for handling the shares prior to sale. It has been stipulated by the parties that Daniel's transfer to Vincent of the 47 subscription rights to MTL stock was without any monetary consideration paid to Daniel T. Galluzzo and "rendered [him] insolvent and without assets with which to pay" the deficiencies in and additions *64 to his 1970 and 1971 Federal income taxes. The Commercial Law Code of the State of Maryland provides as follows: SUBTITLE 2. FRAUDULENT CONVEYANCES. SECTION 15-201. DEFINITIONS. (a) In general.--In this subtitle the following words have the meanings indicated. (c) Conveyance.--"Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of * * * property SECTION 15-203. FAIR CONSIDERATION. Fair consideration is given for property or an obligation, if: (1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or (2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained. SECTION 15-204. CONVEYANCE BY INSOLVENT. Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration. *65 SECTION 15-209. RIGHTS OF CREDITOR WHOSE CLAIM HAS MATURED. (a) Setting aside or disregarding conveyance.--If a conveyance or obligation is fraudulent as to a creditor, the creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or one who has derived title immediately or mediately from such a purchaser: (1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim; or (2) Disregard the conveyance and attach or levy execution on the property conveyed.
An executory promise to provide services in the future is not sufficient to support a debtor's conveyance of property. Md. Com. Law Code Ann. sec. 15-203; Westminster Savings Bank v. Sauble, 39 A.2d 862, 864 (Md. 1944). In Maryland, an inpersonam judgment against a fraudulent transferee is an available remedy to a creditor "where the transferee causes the property to depreciate in value or parts with the property without sufficient consideration * * *. The form of the relief should be so framed as 'to place the *66 judgment creditor in the same * * * position he held with respect to the fraudulent transferor prior to the fraudulent conveyance.'" Damazo v. Wahby, 305 A.2d 138, 143 (Md. 1973). Under the provisions of Maryland law outlined above, it is clear that Vincent Galluzzo was a transferee of Daniel's subscription rights. Daniel transferred all of his right, title, and interest in and to the subscription rights to Vincent, upon the trust as described above. Under the broad language of Md. Com. Law Code Ann. section 15-201(c), quoted above, a transfer in trust is a "transfer" and is therefore embraced within the term "conveyance." See United States v. Estes, 450 F.2d 62, 64-65 (5th Cir. 1971). This conveyance was made without "fair consideration" within the meaning of Md. Com. Law Code Ann. section 15-203 because David received in exchange neither property nor cancellation of an antecedent debt. Vincent's agreement to manage the stock was merely an executory promise to provide services in the future and did not constitute "fair consideration" within the meanding of section 15-203. Daniel was rendered *67 insolvent by the transfer to Vincent. Thus, Daniel made a "conveyance" to Vincent "without a fair consideration" and was "rendered insolvent by it." Accordingly, under Md. Com. Law Code Ann. section 15-204, the transfer was fraudulent as to Daniel's creditors, including the United States. Under Md. Com. Law Code Ann. section 15-209, the United States may have the conveyance set aside or may disregard the conveyance and attach and levy upon the MTL stock in Vincent's hands. The Omni Research, Inc., stock was sold for $ 10,476 in 1976. It is not clear exactly where the proceeds of this sale ended up. Daniel testified at trial first that he received two-thirds of the proceeds, then that he received $ 10,000 of them, and then again that he received two-thirds. On his 1976 Federal income tax return, he reported the full $ 10,476 as the amount which he realized from the sale of the stock. The inconsistency is not terribly critical, however. If Vincent retained any of the proceeds, the United States could of course reach them in his hands; if he transferred any of them back to Daniel, he would come within the rule quoted *68 in Damazo v. Wahby, supra, and be personally liable for the amount of the proceeds transferred. We, therefore, have no trouble concluding that Vincent is liable as a transferee; as outlined above, however, the amount of his liability is far less than the $ 188,000 claimed by respondent. Respondent appears to contend that Vincent is personally liable for the difference between the value of the subscription rights as of July 19, 1972 (which he claims to have been $ 188,000) [6] and the $ 10,476 proceeds of this sale to Omni Research, Inc. Respondent has the burden to prove that Vincent is liable as a transferee of Daniel. Sec. 6902(a). In order for Vincent to be liable for more than the $ 10,476 proceeds, respondent must show that Vincent caused the MTL stock to depreciate in value or that he at some point parted with it for less than sufficient consideration. Damazo v. Wahby, supra; sec. 6902(a). Respondent has presented absolutely no evidence of such behavior on Vincent's part. As the court stated in United States v. Estes, supra at 66: *69 "[I]t may be that the * * * stock is now worth only half what it was worth when transferred to the appellants. But it is surely possible--we do not know--that any decline in value may simply reflect adverse market conditions and cannot be attributed to derelication of the appellants' duties as "trustees." We also note that Vincent and Daniel had a direct pecuniary interest in seeing that they received as much consideration as possible for their stock. Respondent cannot obtain a better position by reason of the constructively [7] fraudulent transfer than if Daniel had himself retained the stock. Damazo v. Wahby, supra at 142. Therefore, we conclude that Vincent is liable as a transferee of Daniel's subscription rights to the extent of $ 10,476.
Issue 8. Gift Tax for 1972
The next issue we consider is whether Daniel in 1972 made a completed gift to Vincent upon the transfer of the subscription rights described in the findings of fact, supra at 16-17. Respondent contends very simply that Daniel transferred the subscription rights to Vincent *70 without consideration and, therefore, made a "gift" to him of the entire value of the stock rights transferred. The situation is much more complex than that. The transfer was made (1) because Daniel found it necessary to resign as MTL's president due to the pending narcotics investigation, and (2) pursuant to the July 19, 1972, agreement which provided that, upon the eventual sale of, or establishment of a market price for, the stock, Vincent would remit two-thirds of the proceeds (or total market price) to Daniel and retain one-third to compensate him for managing the stock. [8] In fact, when the stock was sold, Daniel reported the full sales price as the amount realized upon the sale of the Omni Research, Inc., stock and Vincent reported $ 2,625 as ordinary income for managing the stock. *71 The gift tax is applicable only to transfers of beneficial interests in property. It is not applicable to a transfer of bare legal title to a trustee. Sec. 25.2511-1(g)(2), Gift Tax Regs. The tax applies only to transfers of property made for less than full and adequate consideration in money or money's worth. Sec. 25.2511-1(g)(2), Gift Tax Regs. Daniel essentially transferred his rights to Vincent in trust to manage, sell, and remit two-thirds of the sale proceeds to Daniel. Thus, as to an undivided two-thirds of the rights, Daniel made no gift as he did not fully part with dominion and control over them. He in effect retained beneficial ownership of these rights. The one-third of the sales proceeds which Vincent was entitled to retain (he in fact ended up retaining less than one-third of the proceeds) in the event of sale represented his "commission" for handling the stock. Vincent no doubt was required to perform valuable services in managing the stock. Daniel was no longer in a managerial position with MTL due to the criminal investigation; thus, Vincent was saddled with a good deal of managerial responsibility. During the years after Daniel's resignation, MTL underwent *72 a recapitalization and a sale (to Omni Research, Inc.). As MTL was closely held, and as, at the time of the transfer, a Federal criminal investigation was pending, the value of MTL's stock was highly speculative.[9] We are accordingly in no position to say that, at the time of the transfer, a one-third commission was excessive. The Gift Tax Regulations provide that a transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from donative intent) will be considered as made for an adequate consideration in money or money's worth. Sec. 25.2512-8, Gift Tax Regs. Daniel organized and created MTL. We do not think it likely that he would so cavalierly give away his interest in it. Also, the agreement was actually, in large part, carried out in 1976, when the Omni Research, Inc., stock (received in exchange for the MTL stock) was sold. We conclude from a review of all of the relevant facts that the transfer of subscription rights were motivated by Daniel's *73 desire to remove himself from active participation in MTL's affairs while still retaining beneficial interest in MTL, and was not a "gift." Issue 9. Daniel's Fraud for 1970 and 1971
Section 6653(b) provides: (b) FRAUD.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * We have found that Daniel underpaid his Federal income tax for 1970 and 1971. The issue now is whether any part of either of these underpayments was due to fraud.
The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Respondent has the burden of proving fraud and he must establish it for each taxable year involved by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner, 276 F.2d 122 (5th Cir. 1960). To establish fraud, respondent must show that the taxpayer filed his return with the specific intent to evade a tax believed to be owing. Wilson v. Commissioner, 76 T.C. 623, 634 (1981). *74 Because direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof with circumstantial evidence. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Such evidence includes conduct calculated to mislead or conceal. Spies v. United States, 317 U.S. 492, 499 (1943); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (5th Cir. 1978). Understatements of income are evidence from which fraud may be inferred. Marinzulich v. Commissioner, 31 T.C. 487, 490 (1958).Respondent may not, however, rely upon Daniel's mere failure to prove error in the Commissioner's determination that he earned unreported income from the illegal sale of narcotics. The "burden of proof" and "presumption of correctness" are procedural devices at the government's disposal in collecting tax revenues; they may not be bootstrapped into affirmative evidence of fraud. Holland v. United States, 348 U.S. 121, 137-138 (1954); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). *75 In the case at bar the respondent has introduced much affirmative evidence implicating Daniel in the drug sales. It has been shown that Daniel was the key figure in the scheme. It was he who applied for the narcotics permit; who signed the purchase order forms; who, most of the time, dealt with David Weiner and picked up the cocaine and Dilaudid from Loewy Drug Co.; and who performed phony laboratory testing in order to help provide a "cover" for the diversion. Daniel accompanied Chris to the apartment in 1969 where the drugs that they brought with them were tested for quality by a drug user. Daniel and Chris were very close and shared many financial and other ventures. In short, respondent has adduced affirmative evidence that Daniel earned unreported income in 1970 and 1971.
The failure to maintain books and records of incomeproducing activities is another indicium of fraud. Otsuki v. Commissioner, 53 T.C. at 109. Daniel kept no records of his earnings from the illegal drug sales. The inference of fraud here is even more compelling because, on account of Daniel's educational and professional background (engineering degree, legal education, and employment *76 by the National Security Agency), he was likely to have been aware of the requirement that records be kept. Daniel's conduct throughout the audit is cogent evidence of fraud. He was generally evasive and uncooperative. See generally our findings of fact, supra at 20-22.For example, Daniel claimed to Revenue Agent Furman that he was completely innocent of involvement in the conspiracy and yet acknowledged his guilt before the District Court; Daniel gave Furman varying versions of his ownership of MTL stock; he told him that his accountant had the records of his automobile and home office expenses when the accountant in fact did not; and Daniel told Furman that he had borrowed between $ 1,400 and $ 1,500 from Robert Bonsall when in fact he had not.
Misrepresentations made to a revenue agent during an audit are strong evidence of fraud. United States v. Newman, 468 F.2d 791, 794 (5th Cir. 1972), cert. denied 411 U.S. 905 (1973). We accordingly conclude that respondent has met his burden of proving that part of Daniel's underpayments of Federal income tax for 1970 and 1971 were due to fraud. Issue 10. Statute of Limitations
Daniel did *77 not file his 1972 return until March 12, 1974. Therefore, the Commissioner had until March 12, 1977, to assess Daniel's 1972 Federal income tax. The statutory notice was mailed January 10, 1977, before the period for assessment for 1972 had expired. Sec. 6501(a). The period for assessment of Daniel's 1971 tax liability was originally due to expire April 15, 1975. Sec. 6501(b). The period was validly [10] extended, pursuant to section 6501(c)(4), on March 21, 1975, March 16, 1976, and June 4, 1976, to the 90th day following (1) the mailing of the statutory notice or (2) the receipt of the taxpayer's election to terminate the agreement. Thus, the statutory notice was mailed within the period for assessing Daniel's 1971 tax liability. The period for assessing taxes for the 1970 taxable year is more problematic. It was originally due to expire April 15, 1974. Sec. 6501(b). It was extended on November 20, 1973, to April 15, 1975. It was not subsequently extended prior to the latter date. Thus, unless the 1970 return *78 was fraudulent or omitted from gross income more than 25 percent of the amount of gross income stated in the return, the period of assessment expired prior to the mailing of the statutory notice. Sec. 6501(c)(1), (e)(1).
We have found that Daniel's 1970 Federal income tax return was fraudulent.Thus, under section 6501(c)(1), the Commissioner could have assessed the 1970 tax liability at any time. Therefore, the statutory notice as to the taxable year 1970 was timely mailed. To reflect the foregoing, Decision will be entered for the respondent in docket Nos. 3525-77 and 3526-77. Decision will be entered under Rule 155 in docket No. 3527-77.
Decision will be entered for the petitioner in docket No. 8311-77. Footnotes
1. Cases of the following petitioners have been consolidated herewith by order dated April 20, 1979: Vincent Galluzzo and Angela Galluzzo, docket No. 3526-77; Vincent Galluzzo, Transferee, docket No. 3527-77; and Daniel T. Galluzzo, docket No. 8311-77.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. Petitioners do not contest on brief the following determinations of the Commissioner: (1) that Daniel had a taxable but unreported capital gain of $ 2.50 during 1972; (2) that Daniel was not entitled to claim a personal exemption for his wife, Victoria, for 1970; (3) that Daniel received $ 2,709 of income as a result of purchasing a prefabricated home in 1972 from his employer at a discount; and (4) any determinations with respect to the Federal income tax of Vincent and Angela Galluzzo for 1971 and 1972. Petitioners do contest the Commissioner's determination that Vincent is liable as a transferee of Daniel's assets.↩
4. Petitioner on brief would appear to imply that the Commissioner's determinations as to Daniel's participation in the wholesaling venture and as to the amount of income he earned therefrom are "arbitrary and excessive" within the meaning of Helvering v. Taylor, 293 U.S. 507 (1935), and its progeny, and that accordingly the burden of proof shifts to respondent. We do not agree with petitioner's implication. The procedures and evidence that Furman used in arriving at his conclusions, which we have set out supra↩ at pages 10-12, clearly show that he did not act arbitrarily.
5. Catanzaro testified at trial that he, Chris, and Daniel had an agreement to divide the profits from the diversion of drugs three ways.The Commissioner's agent, however, attended all of the trials and sentencing proceedings in the matter and had an opportunity to view the relevant documents. His determination is presumptively correct and no evidence has been introduced which would show it to be arbitrary and capricious. In fact, there is no credible evidence that it is erroneous.↩
6. In 1972, Paul Russo purchased five shares of MTL stock for $ 20,000. However, the value of the stock at the time of transfer is not relevant unless the subsequent decline in value is due to the negligent or intentional conduct of the transferee, as discussed below, and we conclude that, in the instant case, it was not.↩
7. We need not and do not decide whether, under Mayland law, the transfer was actually fraudulent.↩
8. The deed of trust executed by Vincent on March 14, 1973, relevant portions of which are set out supra at 18-20, is not inconsistent with this agreement. Vincent as trustee was empowered to sell the MTL stock (or any other trust asset), terminate the trust, and distribute the proceeds to himself, which he could then use to fulfill his agreement with Daniel. Under paragraph FIFTH he would appear to have had the power to sell the stock and distribute the appropriate amount of proceeds to Daniel directly. After his death, the successor trustee could sell the stock and distribute it as Vincent directed in his will; if the will did not provide for the distribution of the appropriate amount of proceeds to Daniel, Daniel would have a claim upon Vincent's estate for that amount. Also, the successor trustee would appear to have had the same powers under paragraph FIFTH as did Vincent. The terms of the trust show that its primary purpose was to prevent Daniel from ever regaining any ownership interest in MTL rather than to prevent him from obtaining his share of future sales proceeds and, in this sense, would accord with and further Daniel's stated objective of dissociating himself from the corporate affairs in the interest of the other stockholders. The actual course of events is, however, the most persuasive evidence of the validity of the July 19, 1972, agreement.In 1974, Vincent and the other MTL shareholders exchanged their MTL stock for that of Omni Research, Inc. In 1976, Omni Research, Inc., repurchased its stock from Vincent for $ 10,476, which Daniel reported on his 1976 Federal income tax return as an amount realized from the sale of Omni Research, Inc., stock. Vincent reported $ 2,625 on his 1976 return as ordinary income pursuant to the July 19, 1972, agreement.Thus, the parties acted consistently with the terms of the July 19, 1972, agreement. Also, none of their actions were inconsistent with the March 14, 1972, trust. Pursuant to paragraph FIRST (b)(i), upon the exchange of MTL stock for Omni Research, Inc., stock, the trust estate terminated and the assets therein (the Omni stock) became owned by Vincent individually. He was, therefore, free to sell the stock and pay over the proceeds to, or hold them upon constructive trust for, Daniel, which we infer he did.↩
9. The underwriters who were financing the public offering of MTL's stock rejected the offering upon learning of the narcotics entanglement. See supra↩ at 16.
10. Petitioner does not contend, nor is there any evidence, that the extension agreements were invalid by reason of being procurred through duress, etc.↩